Joshua G. Harris
In Care of:725 Hertel Avenue
P.O. Box #223
Buffalo NY, [14207]
716.598.0150 |
Joshua.Harris14217@gmail.com

# UNITED STATES DISTRICT COURT WESTERN DISTRICT

JOSHUA G. HARRIS

           Plaintiff,

vs.

CITY OF BUFFALO, MARCUS ROGOWSKI,
DONALD MYERS, LARRY MUHAMMAD,
SOMALIA DOYLE, SEAN FORD, VICTOR FERRO,
JOSEPH TYSON, CHARLES MILLER, WILLIAM
MORETTI, RYAN A. GEHR, DANIEL CARLSON,
KEVIN BRIDGE, ARKA BOH, AND JACOB VITELLO

           DEFENDANTS,

Case No. 26-cv-

**26 CV 1112**

COMPLAINT



UNITED STATES DISTRICT COURT
FILED
JUN 1 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

## PARTIES

1. Plaintiff, JOSHUA G. HARRIS, (hereinafter "PLAINTIFF") was a resident in Erie County at the time of the incident.

2. Upon information and belief, at all relevant times stated herein, Defendant CITY OF BUFFALO (hereinafter "BUFFALO") is a municipal corporation organized and existing under the laws of the State of New York and the United States Constitution, with principal offices at 65 Niagara Square, in the City of Buffalo, County of Erie, State of New York 14202.

3. Upon information and belief, at all relevant times stated herein, MARCUS ROGOWSKI (hereinafter "ROGOWSKI"), DONALD MYERS (hereinafter "MYERS"), LARRY MUHAMMAD (hereinafter "MUHAMMAD"), SOMALIA DOYLE (hereinafter "DOYLE"), SEAN FORD (hereinafter "FORD"), VICTOR FERRO (hereinafter "FERRO"), JOSEPH TYSON (hereinafter "TYSON"), CHARLES MILLER (hereinafter "MILLER"), WILLIAM MORETTI (hereinafter "MORETTI"), RYAN A. GEHR (hereinafter "GEHR"), DANIEL CARLSON (hereinafter "CARLSON"), KEVIN BRIDGE (hereinafter "BRIDGE"), ARKA BOH (hereinafter "BOH"), AND JACOB VITELLO (hereinafter "VITELLO") were residents of the County of Erie, State of New York during the time when the incidents occurred, of which their general base of operations are located at the Buffalo Police Department Headquarters located at 68 Court Street Buffalo, New York 14202.

## JURISDICTION

4. This Court has jurisdiction over this lawsuit pursuant to the Civil Rights Act, Title 42 United States Code § 1981 & §1983 on the grounds that these Defendants have deprived the Plaintiff of his guaranteed rights, which this action arises under the United States Constitution, particularly under the provisions of the First and Fourth Amendments.

5. Venue also lies in this Court pursuant to Titles 28 U.S.C §1331, §1343, §1367, §1391 (b), §2201 (a), §2202, 18 U.S.C §241, & §242.

6. Each of the acts of Defendants ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, TYSON, MILLER, MORETTI, GEHR, CARLSON, BRIDGE, BOH, AND VITELLO were acting in concert with Defendant BUFFALO; as they performed in the course of their employment, acting in their authority as police officers under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of New York, County of Erie, and the City of Buffalo, for the City of Buffalo prior to them waiving their qualified immunities.

7. Each of the Defendants are being sued in each of them in their individual, official, personal and private capacities, on each and every cause of action.

# JURY DEMAND

8. Plaintiff hereby demands a trial by jury.

# NOTICE OF CLAIM

9. Plaintiff, in furtherance of his state causes of action, has filed a timely notice of claim against the City of Buffalo in compliance with General Municipal Law Section 50.

10. More than 30 days have elapsed since service of said notice, and the City of Buffalo has failed to pay or adjust the claim.

11. This action commenced within one year and ninety days after the events upon which these state claims arise.

## ALLEGED FACTS TO ALL CLAIMS

### First Incident arises on June 4, 2023

### Against Defendants ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, TYSON, AND BUFFALO

12. The occurrence of the incident arising from, inter alia, within this complaint, that on June 4, 2023, the PLAINTIFF was street preaching on the corner of Elmwood Avenue and Allen Street during the Gay Pride Parade in the City of Buffalo on or about 12:15 pm, the PLAINTIFF had several "on-lookers" engage with conversation with the PLAINTIFF.

13. As the PLAINTIFF preached, from time to time; he would notice a crowd form around him to begin engaging with him, he would then peacefully wander away from the crowd to gather his personal space from them to continue his preaching from a distance.

14. When the PLAINTIFF notices the crowd growing larger, he would then walk away from them completely, only to be followed; forcing him to go back to his original position to regain his personal space to continue his preaching.

15. The PLAINTIFF eventually found himself walking back and forth, avoiding the crowd surrounding him, to the point that the PLAINTIFF ended up in front of Jim's Steak-

Out Restaurant, on the sidewalk of the public corner, where he was approached by Defendant DOYLE.

16. Without gathering articulable facts of wrongdoing, Defendant DOYLE confronted the PLAINTIFF warning him by stating that, "If you gonna cause problems, then I'm gonna have to ask you to leave", or words to that effect.

17. The PLAINTIFF then asked Defendant DOYLE where he was standing, that he was standing on public property, and that he had a right to free speech of which hecklers do not have a right to veto his speech, then he implored her to honor the Constitution.

18. One of the "on-lookers" informed Defendant DOYLE that, "Nobody was doing anything wrong", or words to that effect.

19. After hearing that, DOYLE then disengaged from the PLAINTIFF and immediately called for back-up.

20. Defendant FORD arrived on scene and confronted the PLAINTIFF by stating, "If you can give these guys – you can record me, if you can give these guys (on-lookers) 5 minutes, these guys will move on, and you could send your message to a whole new group of people." Or words to that effect.

21. The PLAINTIFF responded, "I rather send my message here," to Defendant FORD.

22. Defendant FORD persisted to have the PLAINTIFF stop preaching by saying, "Ok but I want to keep these people moving."

23. The PLAINTIFF responded, "I don't care what you want. Just leave me alone."

24. Defendant FORD then stated, "I was just asking.... You're not doing anything wrong, it's just that you would get your message across to more people if you would stop (stop preaching) for a minute and they (on-lookers) would just start walking that way" or words to that effect.

25. The PLAINTIFF stated, "The word of God does not return to him void."

26. Defendant FORD told the PLAINTIFF that, "You get the message to more people."

27. The PLAINTIFF responded, "It doesn't matter. I give the message where I stand."

28. As Defendant FORD was standing next to Defendant DOYLE, the PLAINTIFF informed to FORD, by pointing at DOYLE, "She needs to be educated on the Constitution, otherwise she is going to end up losing her qualified immunity."

29. Defendant FORD once again stated, "You're not doing anything wrong,"

30. The PLAINTIFF then corrected FORD by stating, "Then Educate her! She told me that I was doing something wrong."

31. DOYLE and the PLAINTIFF was then having a back-and-forth discussion on DOYLE telling the PLAINTIFF, "You can do whatever you want to do", as the PLAINTIFF responded, "Apparently not to you! Apparently to you, I was causing a disturbance! Free Speech does not cause a disturbance."

32. The PLAINTIFF then disengaged and continued preaching as more Buffalo Police Officers arrived on scene.

33. Defendants MUHAMMAD, FERRO, AND TYSON arrived on scene to huddle with DOYLE AND FORD to conspire a plan to remove the PLAINTIFF, but only to realize

that there was nothing they could do to remove the PLAINTIFF because they determined that he was clear of any wrongdoing.

34. Defendant FORD then went inside Jim's Steak-Out Restaurant to make a phone call to an unidentified higher-ranking officer.

35. Defendant FORD, during his phone call is seen on his body worn camera making the following statement, "So basically what's going on here is that there's a "religious fella here who's got the crowd fired up on Elmwood and Allen, so everybody has stopped in the middle of the street to give this guy a hard time. So, I'm trying to work my best with him right now but the parade is not moving because everybody is engaging this fella, so- yeah, but everyone's ok here, it's safe, I'm just trying to get the parade moving…alright thanks, bye" or words to that effect, then FORD proceeded to exit the restaurant to return back to the huddle.

36. When Defendant FORD returned to the huddle with Defendants MUHAMMAD, FERRO, TYSON, and DOYLE, Defendant FORD made the following statement, " So I had a talk with him (PLAINTIFF) already, they're not going to keep moving until he (PLAINTIFF) stops talking, So I said, hey listen sir (referring to the PLAINTIFF), you're not doing anything wrong but you gotta stop talking for a minute, let these people pass and you get your message to more people, he's in his glory right now, he is not going to stop, the parade is not going to move till he goes away but I don't think we could do anything." Or words to that effect.

37. As the same Defendants huddled up trying to figure out how to remove the PLAINTIFF, they've witnessed a female on-looker approaching very close to the PLAINTIFF'S face saying, "I love eating fucking pussy, I love it. Don't you?! Or words to that effect, the Defendants in the huddle did nothing to de-escalate the situation but were more focused on moving the parade along.

38. Defendant FORD continued as beads starting to fly at the PLAINTIFF and the officers by stating, "It's gonna come to a point that we are going to have to protect him (PLAINTIFF) at some point.

39. Defendant MUHAMMAD inquired, "What if we make him (PLAINTIFF) step out of the parade at some point, is that in our scope?"

40. FORD answered, "we could articulate that he (PLAINTIFF) was inciting some violent situation, like he says come on hit me, come hit me, then I would say we draw the line. But it's going to come down to us having to protect him."

41. Defendant DOYLE then added, "we are going to have to because they are all up in his face."

42. After acknowledging that the on-lookers were harassing the PLAINTIFF, the police officers continued to look on.

43. Soon afterwards, Defendants MUHAMMAD, FERRO, TYSON, DOYLE, AND FORD, as they looked on in their huddle, witnessed the same female on-looker that engaged with the PLAINTIFF before, went behind the PLAINTIFF and smacked his (the PLAINTIFF'S) phone out of his hand, damaging it.

44. As the PLAINTIFF tried to retrieve his phone, a male on-looker approached the PLAINTIFF to physically come into contact with the PLAINTIFF, then the on-looker proceeded to run up to Defendant MUHAMMAD saying, "You see?! He just assaulted me! Arrest him! I want to press charges against him!!"

45. Defendant MUHAMMAD corrected the male on-looker by saying, "he was pushed, someone shoved him, I seen what happened, she (female on-looker) smacked the phone out of his hand", none of the officers arrested the female attacker.

46. After witnessing the PLAINTIFF being attacked, Defendant FORD approached the PLAINTIFF and told him, "If you go over here, I will stand in front of you, so nobody will hit you."

47. The PLAINTIFF asked FORD in response, "Are you going to do your job? You saw what happened right?"

48. FORD, answers, "Yep".

49. The PLAINTIFF stated, "You care less about me, just do your job"

50. Then Defendant FORD, instead of making any arrest, walked away but not without saying, "ok, I'll leave you alone." Then he reported to MUHAMMAD a false narrative of what his conversation with the PLAINTIFF was by stating, "He said he doesn't want our help, he says that he didn't want a buffer zone. He said that He didn't want us to protect him." Or words to that effect.

51. After the male on-looker's false complaint failed, he then pivoted by going up to MUHAMMAD AND FERRO to inform them that the PLAINTIFF allegedly needed a permit to carry a bullhorn.

52. It was not until the on-looker going up to MUHAMMAD AND FERRO to inform them that the PLAINTIFF allegedly needed a permit to carry a bullhorn., did MUHAMMAD walked away to make a phone call to an unidentified higher ranking officer, informing him that the PLAINTIFF was not a really big issue but he has had civilians coming up to him and inquiring if there is a requirement to have a permit to have a bullhorn. MUHAMMAD admitted during his phone call that he was ignorant and did not know the laws regarding having a bullhorn.

53. The PLAINTIFF eventually took FORD'S advice and left the area, only to be followed and further harassed and force to go back to the original spot in front of Jim's Steak-Out, Defendants MUHAMMAD, FERRO, TYSON, DOYLE, AND FORD acknowledged that the PLAINTIFF left and returned, after seeing the male on-looker, and a group of others follow him, the Defendants did nothing to stop the harassment.

54. As they continued to conspire, they as a group agreed that it was easier to remove the one preacher (PLAINTIFF) as opposed to attempt to de-escalate and handle crowd control.

55. After talking with their higher-ranking officers, TYSON stated to the remaining officers, "He (referring what FORD mentioned earlier) brought up a good point, he said to listen to the PLAINTIFF, if he says anything that incites any violence such as 'come hit me' then we can pick him up." Or words to that effect.

56. Defendants MUHAMMAD, DOYLE, FORD, FERRO, and TYSON huddled again to discuss a plan to enforce a makeshift authority to penalize the PLAINTIFF for not having a permit for his bullhorn.

57. Defendant FORD noticed that the PLAINTIFF was wearing a personal body worn camera then stated, "This guy has a professional body worn camera, he seems like he knows his rights, he seems like he knows his stuff and he will sue all of us."

58. Defendant MUHAMMAD added, "His body cam even looks better than ours", or words to that effect.

59. Defendant ROGOWSKI and MYERS arrived on scene to confront the PLAINTIFF, and immediately the PLAINTIFF found himself surrounded by MYERS, MUHAMMAD, DOYLE, FORD, FERRO, and TYSON.

60. Defendant ROGOWSKI asked the PLAINTIFF if he had a permit to use amplification in the City of Buffalo.

61. The PLAINTIFF asked ROGOWSKI what the Fifth Amendment was.

62. Defendant ROGOWSKI informed the PLAINTIFF that he had checked with the offices of "Permit and Inspections" and that they allegedly (when the local government offices were closed at the time of the parade) informed ROGOWSKI that it's required to have a permit to use a bullhorn.

63. When the PLAINTIFF asked what law is he getting this alleged information from, ROGOWSKI ignored the PLAINTIFF and stated, "I can allow you to stay here and voice your opinion but You would have to be within our guidelines and our guidelines states that you need to have a permit to use a bullhorn for amplification."

64. When the PLAINTIFF continued to ask for clarification of what law is he required to have a permit for his bullhorn, after several times because ROGOWSKI claimed that he could not hear the PLAINTIFF, he finally answered, "it's a city ordinance"

65. When the PLAINTIFF asked for clarification of which ordinance, the PLAINTIFF informed ROGOWSKI that he would be suing him if he continued to enforce the alleged ordinance.

66. Defendant FORD after warning other officers that the PLAINTIFF will sue because he seems that he knows his rights and that he has a body warn camera, stood right next to ROGOWSKI and did nothing as the PLAINTIFF warned ROGOWSKI that if he didn't honor his oath to the Constitution, that he will be suing him.

67. The PLAINTIFF tried to break contact with ROGOWSKI but not until he asked ROGOWSKI if he has reasonable articulable suspicion that the PLAINTIFF had

committed a crime, of which ROGOWSKI answered, "Sir, I am not accusing you of a crime."

68. The PLAINTIFF informed ROGOWSKI that he will be using amplification, ROGOWSKI said, "at this point you will not".

69. The PLAINTIFF said, "I will".

70. The PLAINTIFF then broke his engagement with ROGOWSKI and continued preaching.

71. As the PLAINTIFF walked away from the surrounding officers, ROGOWSKI then ordered Defendant MUHAMMAD to seize the PLAINTIFF by grabbing his bullhorn, tugging, bending, and damaging his bullhorn.

72. The PLAINTIFF was then shoved to the street by the officers that were surrounding him, he was stripped from his bullhorn and taken into custody in cuffs by MUHAMMAD and MYERS as the crowd cheered on.

73. The PLAINTIFF was then placed inside of a police cruiser for over an hour in the hot heat without air conditioning until the parade concluded. Defendant FERRO, looked the PLAINTIFF up on RIKKI, then informed ROGOWSKI, "Oh he is that guy that goes around and records everybody then ends up suing everyone." Or words to that effect.

74. The PLAINTIFF was then transported against his will, outside the Erie County Holding Center where booking is located.

75. ROGOWSKI then searched through his backpack, then was released and was taken back to the corner of Elmwood Avenue and Allen Street, of which he was released on an appearance ticket.

76. The PLAINTIFF was charged and prosecuted when ROGOWSKI submitted three accusatory instruments of the following charges against the PLAINTIFF'S as follows: **DISORDERLY CONDUCT under New York Penal Law § 240.20, RESISTING ARREST under New York Penal Law § 205.30**, and **OBSTRUCTING GOVERNMENTAL ADMINISTRATION under New York Penal Law § 195.05**.

77. All charges were dropped and dismissed in his favor in February 2026.

**Second Incident arising on September 24, 2023**

**Against Defendants**

**GEHR, MORETTI, MILLER, CARLSON, BRIDGE, AND BUFFALO**

77. The PLAINTIFF, repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "76", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein, that on Sunday September 24, 2023, at approximately 11:04pm, the PLAINTIFF have received a phone call from his relative, informing him that he was witnessing three police officers of the Buffalo Police Department, "looking around" and "into" the PLAINTIFF's van of which was parked across the street at 376 Dearborn Street from his house.

78. With the PLAINTIFF'S body camera on, along with his cellphone camera recording the incident; the PLAINTIFF approached the officers to gain understanding on the nature of their inquiry.

79. The PLAINTIFF noticed that two police officers of what it appeared to be Defendants CARLSON and BRIDGE, were in positioned behind his parked van in the middle of the street in their police cruiser, while the 3rd police officer, Defendant GEHR; was standing in position, on the passenger side behind the police cruiser approximately 5 yards back from the cruiser next to his cruiser which was parked further down from the first cruiser.

80. Upon the PLAINTIFF'S observation, both police cruisers have not employed their emergency lights nor sirens but stood quietly in observing the PLAINTIFF'S van.

81. The PLAINTIFF asked the officers if he could help them, of which they responded that they didn't need any help. The PLAINTIFF then asked them what the nature of their inquiry was and why they were observing the van.

82. They responded that it was none of the PLAINTIFF'S business and that it was "police business" and to go about his way.

83. They then asked the PLAINTIFF how may they help him, of which the PLAINTIFF responded, "I didn't need your help other than why you guys are observing the van."

84. Instead of simply asking if the van was the PLAINTIFF'S or to even attempted to initiate a traffic stop, they instead informed the PLAINTIFF that it was "police business" and that he was free to go.

85. The PLAINTIFF asked, "So, am I being detained?", of which the Defendants answered "No!", you are free to go."

86. After realizing that the PLAINTIFF was free to go and there was no traffic stop, thinking that if might be something else they were looking into, the PLAINTIFF then walked towards his van, then unlocked his van to sit in it, to show the officers that the van is not abandoned, as soon as he was closing the driver's door upon entering the van, without a moments notice, the PLAINTIFF was met with orders shouting at him stating, "Don't go into the van, its being towed! GET OUT OF THE CAR!"

87. Without asking for any documents or to thoroughly investigate if the PLAINTIFF owned the van, the officers were shouting orders at the PLAINTIFF at the same time, Defendant GEHR immediately inserted his arms, blocking the door from being shut, while BRIDGE and CARLSON rushed out of their car to assist GEHR.

88. Now at this point Defendant GEHR, BRIDGE, and CARLSON went hands on, grabbing the PLAINTIFF's arms of which the 4th police officer (unknown as to which one at the time), snatched the keys from the PLAINTIFF'S left hand, as the PLAINTIFF was pleading with the officers to deescalate and calm down.

89. As the PLAINTIFF was pleading for the officers to calm down, one of the officers unlocked the PLAINTIFF'S door to open the passenger front side door, the PLAINTIFF found himself held at taser point, as one of the officers threatened to taze the PLAINTIFF if he didn't follow their commands.

90. The PLAINTIFF then informed the officer that he was not a threat and the use of force for a taser is not reasonable. The officer then put his taser away and continued to shove the PLAINTIFF out of the van.

91. The PLAINTIFF continued to plead with the officers and that he didn't consent to the searches nor any seizures of his property, urging the officers to deescalate and to get the supervisor, they responded, "No, you don't need a supervisor."

92. The PLAINTIFF was then ripped out of the car and taken to the street pavement in the prone position. The PLAINTIFF then asked why they were doing this. They answered, "We don't recognize your plates, you are on public streets without registration, we are taking your car."

93. The PLAINTIFF then responded, "I do not consent!" The officers responded, "Stop resisting!".

94. The Defendants cuffed the PLAINTIFF without even telling him that he was placed under arrest. When the cuffs were applied, the PLAINTIFF ask why they were cuffing him, one of the officers informed him, "You are under arrest for resisting arrest".

95. The officers then placed the PLAINTIFF inside the back of GEHR'S cruiser, single cuffed.

96. Knowing that the PLAINTIFF was obese, instead of double cuffing him, they single cuffed him to tighten the pressure on the PLAINTIFF'S neck and back. The PLAINTIFF told the officers about the cuffs and their response was, "You shouldn't have fought with us."

97. Defendant MORETTI and MILLER arrived on scene along with 15 other police officers about 20 in total, approached the cruiser; the PLAINTIFF informed him of the situation about the cuffs, MILLER'S response was, "are you going to cooperate?"

98. The PLAINTIFF was then temporarily taken out the cruiser to have an additional pair of cuffs to release some of the pressure of the restraints.

99. The officers were laughing, joking, poking fun, taunting, and belittling the PLAINTIFF as he was in the cruiser. The PLAINTIFF'S wife tried to ask for the keys, but they said "No", then they proceeded to tow the van.

100. One of the officers then grabbed the PLAINTIFF'S body worn camera and proceeded to try turning off the camera, damaging it.

101. Defendant MORETTI spoke with a nearby neighbor, which the neighbor stated to MORETTI, that the PLAINTIFF has a YouTube channel about Police Officers and that twenty years ago, the PLAINTIFF would have been dead, or words to that effect.,

102. Defendant MORETTI stated, "Yeah, I know about his channel, we all (meaning all the officers) watch his channel, we know what he does." Or words to that effect, as he continues to shame the PLAINTIFF, of which one of the PLAINTIFF'S videos on his YouTube channel features the PLAINTIFF criticizing MORETTI and GEHR of their unprofessionalism and lack of knowledge of the Constitution and trespass laws.

103. The PLAINTIFF was then taken into custody and charged with various crimes along with various traffic tickets when the van was never in operation nor was the vehicle's engine running.

104. The PLAINTIFF was booked and released from booking the following afternoon.

105. Defendant BUFFALO has a policy that in order for the PLAINTIFF to recover his property, it would have to be registered, insured, for it can only be released to a driver that has a valid license. The PLAINTIFF told several clerks that such policy is unconstitutional, of which went on deaf ears.

106. As the PLAINTIFF'S van was in holding and during the criminal proceedings, the van was accumulating illegal storage fees, of which upon threat, Defendant Buffalo informed the PLAINTIFF that they were going to sell his van even while the criminal proceedings were still commencing.

107. Out of fear of having his property sold against his will, the PLAINTIFF was then forced to register his van, get insurance, and pay several hundreds of dollars to pay the ransom to have his car released from the Buffalo Impound.

108. The PLAINTIFF was charged and prosecuted when Defendant GEHR submitted four accusatory instruments of the following charges against the PLAINTIFF'S as follows: 2 counts of **DISORDERLY CONDUCT under New York Penal Law § 240.20, RESISTING ARREST under New York Penal Law § 205.30, OBSTRUCTING GOVERNMENTAL ADMINISTRATION under New York Penal Law § 195.05, HARRASSMENT IN THE SECOND DEGREE under New York Penal Law § 240.26, and four NEW YORK STATE DEPARTMENT OF MOTOR VEHICLES UNIFORM TRAFFIC TICKETS** of which all of charges and tickets were dropped in the PLAINTIFF'S favor in February of 2026.

**Third Incident arising on April 4, 2026**
**Against Defendants**
**BOH, VITELLO, AND BUFFALO**

109. The PLAINTIFF, repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "108", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein, that on Saturday April 4, 2026, at approximately sometime in the afternoon, the PLAINTIFF, while in his kitchen cooking a meal with the window up noticed two Buffalo Police officers that appeared to be Defendants BOH and VITELLO in the driveway within the curtilage of his home.

110. Defendant VITELLO looked into the window and initiated contact with the PLAINTIFF, by asking the PLAINTIFF if he called them. The PLAINTIFF couldn't hear the officer's questions, so he left the kitchen and met up with the officers outside from the back door in the driveway to continue the encounter.

111. Defendant VITELLO asked the PLAINTIFF if he was involved with the call for service, the PLAINTIFF then answered no. The PLAINTIFF then informed Defendant VITELLO that the house is a four-unit complex of which multiple people live and may have called. The PLAINTIFF gave VITELLO a verbal layout of how the house units are positioned.

112. The PLAINTIFF then noticed that one of the upstairs neighbor's girlfriend that had moved out after a breakup from the tenant was on the phone, with the tenant's father as she was trying to get into his unit.

113. The tenant's father was heard on the phone stating that she was not allowed to enter the unit and to leave. The PLAINTIFF overheard the conversation and informed

Defendants BOH and VITELLO that he was not the actual tenant and that this was a civil dispute.

114. The tenant's father continued to state that she was not welcomed there, that she was not a tenant to the unit. The PLAINTIFF asked the woman who she was on the phone with, of which she answered; "My boyfriend's father". Or Words to that effect.

115. The PLAINTIFF speaking to only the woman, told her, "Why are you talking to him, it's a civil dispute. He has nothing to do with this."

116. The PLAINTIFF then turned to the officers and informed them that it was a civil dispute, and he asked who generated the call.

117. Defendant BOH got very aggressive with the PLAINTIFF, by rudely telling the PLAINTIFF to get back in the house, that this does not concern the PLAINTIFF.

118. The PLAINTIFF then told BOH, "Hey, tone it down, I'm talking to you cordially, lets keep this cordial. Who made the call, what's the CAD number?"

119. Defendant BOH got even more angry and aggressive and informed the PLAINTIFF that he was not going to tell him.

120. The PLAINTIFF informed BOH that it's public record and that he can simply FOIL the information, again the PLAINTIFF asked for the CAD number, BOH then shouted at the PLAINTIFF ordering the PLAINTIFF to go back into the house, stating that the PLAINTIFF was interfering with their (Defendants BOH and VITELLO) investigation.

121. The PLAINTIFF matched Defendant BOH'S tone and told him he had no authority to order someone back into one's home and that an interference with an investigation was a physical act not a verbal act alone.

122. Defendant BOH, lacking any lawful justification; then grabbed the PLAINTIFF as VITELLO joined in, together shoving the PLAINTIFF into the side of his home, applying hand cuffs on the PLAINTIFF.

123. The PLAINTIFF informed them that no law was broken and to let him go. While BOH informed the PLAINTIFF that he was under arrest for interfering with his investigation.

124. Defendant BOH walked the PLAINTIFF approximately 30 feet towards their police cruisers when the PLAINTIFF informed BOH he had no probable cause of which interference is a physical act.

125. BOH then propositioned the PLAINTIFF by saying, "If I place you out of these handcuffs…You're not going to be asking us any more questions? You're going to go into your house, otherwise I'm going to place you under arrest."

126. The PLAINTIFF then asked for clarification, "Let me get this straight…. You are going to let me go but under threat of arrest, you are ordering me to go back into my house without asking any more questions? So, if I ask you what your name and badge number is, will you arrest me?"

127. Defendant BOH refused to answer the PLAINTIFF'S questions and released him.

128.  The PLAINTIFF went inside to come back out with a pen and notepad to gather the Defendant's names and badge numbers and went back inside his house.

129. Once back inside of his house, he asked VITELLO a question through his window by asking, "If I ask you questions from the inside of my house, are you going to come inside my house to arrest me? What is the difference between asking questions inside my house as opposed to asking questions in the driveway of my house?" VITELLO shook his head with a smirk and walked away towards the front of the house with the woman.

130. The PLAINTIFF then asked the Defendants another question from inside his house, saying, "Hey, if I ask you questions now, am I interfering? Am I interfering now?"

131. The officers then took the woman upstairs into the upper unit. Then came back downstairs into the front of the house, of which the PLAINTIFF informed the officers that their qualified immunity is gone and that he will be seeing them in Federal Court.

132. The officers left without any further incident. No charges were ever filed against the PLAINTIFF.

## FIRST CAUSE OF ACTION
### AGAINST
### DEFENDANTS
**ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON:**
**FIRST AMENDMENT RETALIATORY ARREST / RETALIATORY SEIZURE**
### 42 U.S.C. § 1983

133. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "132", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

134. At all relevant times, the PLAINTIFF was engaged in constitutionally protected activity under the First Amendment, including religious street preaching, recording public officials, speaking in a traditional public forum, criticizing police conduct, invoking the Constitution, and warning officers that unlawful interference with his rights could result in civil liability.

135. The PLAINTIFF'S religious preaching took place on a public sidewalk, on the public corner near Elmwood Avenue and Allen Street during the Pride Parade in the City of Buffalo.

136. The PLAINTIFF'S speech addressed religious matters and matters of public concern.

137. The PLAINTIFF did not threaten anyone, did not incite violence, and did not engage in unlawful conduct.

138. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the First Amendment retaliatory arrest/

retaliatory seizure to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

a) known that PLAINTIFF was engaged in protected speech and knew that the PLAINTIFF was not committing any crime or wrongdoing.

b) acknowledged from Defendant Ford specifically to the PLAINTIFF that he was "not doing anything wrong," or words to that effect.

c) acknowledged among themselves (Defendants) that the crowd and onlookers were reacting to the PLAINTIFF'S speech, and that the parade would not continue moving unless the PLAINTIFF stopped talking or went away.

d) focused on stopping the PLAINTIFF'S speech and removing the PLAINTIFF from the area, rather than protecting the PLAINTIFF'S constitutional rights and controlling the crowd;

e) publicly expressed on the Defendants' own statements that was caught on their own body worn cameras and conduct showing that the PLAINTIFF'S protected speech was a substantial and motivating factor in their decision to interfere with the PLAINTIFF, by surrounding him, restricting his use of amplification, seizing his bullhorn, physically seizing him, placing him in handcuffs, confining him in a police vehicle, transporting him against his will, and causing criminal charges to be filed against him.

f) stated words in Defendant FORD, words to the effect that the PLAINTIFF was a "religious fella" who had the crowd "fired up," and that the parade was not moving because people were engaging the PLAINTIFF, "giving him a hard time", of which Defendant FORD further stated words to the effect, that the PLAINTIFF was "not doing anything wrong," but that PLAINTIFF needed to stop talking for a minute so the crowd could pass, of which these facts support that Defendants' actions were directed at the PLAINTIFF'S protected speech and not any lawful criminal basis.

g) discussed removing PLAINTIFF, even though they knew the crowd was the source of the disturbance and even though they acknowledged that they may need to protect the PLAINTIFF from the crowd.

h) further observed, in Defendant FORD, that the PLAINTIFF appeared to know his rights, had a body-worn camera, and would sue the officers, or words to that effect, which further supports that Defendants were well aware that the PLAINTIFF was exercising his constitutional rights before they acted against him.

i) confronted the PLAINTIFF, in Defendant ROGOWSKI about an alleged permit requirement for amplification, failed to identify a specific ordinance when asked, and admitted that he was not accusing the PLAINTIFF of any crime.

j) after realizing that the PLAINTIFF refused to surrender his First Amendment rights and informing Defendant ROGOWSKI that he would continue using

amplification, ROGOWSKI then ordered Defendant MUHAMMAD to seize the PLAINTIFF'S bullhorn.

k)  then grabbed, tugged, bent, and damaged PLAINTIFF'S bullhorn, by Defendant MUHAMMAD, then had the PLAINTIFF shoved to the deck, seized, placed in handcuffs, confined in a police vehicle, transported against his will, and issued an appearance ticket without lawful cause.

l)  chill the PLAINTIFF of ordinary firmness from continuing to engage in protected speech, religious exercise, recording, criticism of police, and petitioning activity.

m)  known that the Defendants lacked probable cause, reasonable suspicion, or any lawful justification to seize, arrest, or retaliate against the PLAINTIFF for exercising his First Amendment rights.

139. Defendants' conduct was intentional, retaliatory, objectively unreasonable, and undertaken under color of state law.

140. As a direct and proximate result of Defendants' retaliatory conduct, the PLAINTIFF suffered loss of liberty, interruption of religious speech, chilling of constitutional rights, emotional distress, humiliation, fear, embarrassment, property damage, criminal prosecution, and other damages.

141. Defendants ROGOWSKI, MUHAMMAD, and MYERS directly participated in the retaliatory seizure and arrest of the PLAINTIFF.

142. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in, encouraged, assisted, approved, or failed to stop the retaliatory course of conduct despite knowing the PLAINTIFF was engaged in protected speech and despite having a realistic opportunity to prevent the violation.

143. By the foregoing acts and omissions, Defendants violated the PLAINTIFF'S rights under the First Amendment to the United States Constitution.

144. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and any other relief this Court deems just and proper.

## SECOND CAUSE OF ACTION

## AGAINST

## DEFENDANTS ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON:

## FIRST AMENDMENT HECKLER'S VETO/ AUDIENCE-REACTION SUPPRESSION, 42 U.S.C. § 1983

145. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "144", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

146. The Plaintiff was engaged in protected religious speech in a traditional public forum on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street during the Pride Parade.

147. The Plaintiff's speech was protected by the First Amendment, regardless of whether members of the public agreed with, disliked, mocked, opposed, or reacted emotionally to Plaintiff's message.

148. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the First Amendment heckler's veto/ audience-reaction suppression to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

a) knew that the PLAINTIFF was not the source of unlawful conduct, of which Defendant FORD specifically acknowledged that the Plaintiff was "not doing anything wrong," or words to that effect.

b) knew that the crowd and onlookers were the persons creating the disruption, confrontation, harassment, and safety concerns, of which Defendant FORD stated words to the effect that the PLAINTIFF was a "religious fella" who had the crowd "fired up," and that the parade was not moving because people had stopped to engage the PLAINTIFF, "giving him a hard time", which Defendant FORD also stated that everyone was safe, and that he was trying to get the parade moving.

c) observed onlookers confronting the PLAINTIFF, getting close to the PLAINTIFF, yelling vulgar statements at the PLAINTIFF, throwing beads and bottles of water at the PLAINTIFF, and escalating the situation, of which Defendant FORD acknowledged that it was going to come to a point where Defendants would have to protect the PLAINTIFF.

d) Defendant Doyle also acknowledged, by Defendant DOYLE that the Defendants would have to protect the PLAINTIFF because the onlookers were "all up in his face," or words to that effect.

e) despite knowing that the PLAINTIFF was the speaker and that hostile onlookers were the source of the disturbance, Defendants did not protect the PLAINTIFF'S speech from the hostile crowd.

f) treated the crowd's reaction to the PLAINTIFF'S protected speech as a reason to restrict, stop, remove, seize, and arrest the PLAINTIFF.

g) witnessed a female onlooker go behind the PLAINTIFF and smack the PLAINTIFF'S phone out of his hand, damaging it.

h) also witnessed a male onlooker falsely accuse the PLAINTIFF of assault after the PLAINTIFF had been pushed or shoved, of which Defendant MUHAMMAD corrected the false accusation by stating words to the effect that the PLAINTIFF had been pushed and that the female onlooker had smacked the phone out of the PLAINTIFF'S hand.

i) even after the Defendants personally observed that the PLAINTIFF was being harassed, assaulted, and falsely accused by onlookers, Defendants failed to control the hostile audience and instead continued focusing on removing the PLAINTIFF.

j)  witnessed the PLAINTIFF eventually attempted to leave the area after Defendant Ford suggested that he move, being followed by the onlookers as they continued to harass him, forcing the PLAINTIFF to return to his previous location.

k)  acknowledged that the PLAINTIFF left and returned after being followed by onlookers, but Defendants still elected to do nothing to stop the harassment or protect the PLAINTIFF'S right to speak.

l)  then agreed, expressly or impliedly, that it was easier to remove the PLAINTIFF, the lone preacher; than to perform crowd control or de-escalate the hostile audience.

149. By removing, seizing, and arresting the PLAINTIFF because of the crowd's reaction to his protected religious speech, Defendants imposed an unconstitutional heckler's veto.

150. Defendants had less speech-restrictive alternatives available, including controlling the crowd, separating hostile onlookers from the PLAINTIFF, arresting or warning persons who assaulted or harassed the PLAINTIFF, creating a lawful protective buffer, or allowing the PLAINTIFF to continue preaching from the public sidewalk without interference.

151. Defendants did not choose those lawful alternatives. Instead, Defendants suppressed the PLAINTIFF'S speech because his message caused a reaction from others.

152. The First Amendment does not permit government officials to silence a speaker merely because listeners dislike, oppose, heckle, threaten, or react negatively to the speaker's message.

153. Defendants' actions chilled and burdened the PLAINTIFF'S First Amendment rights, stopped his protected religious speech, caused his seizure and arrest, and encouraged the hostile crowd by rewarding the crowd's opposition to Plaintiff's message.

154. Defendants ROGOWSKI, MUHAMMAD, and MYERS directly participated in the suppression, seizure, and arrest of the PLAINTIFF.

155. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in the decision-making, observation, approval, encouragement, and failure to protect Plaintiff's speech from the hostile audience, despite knowing that the PLAINTIFF was not doing anything wrong and that the crowd was the source of the disturbance.

156. Defendants acted under color of state law and intentionally, knowingly, or recklessly deprived the PLAINTIFF of his rights under the First Amendment.

157. As a direct and proximate result of Defendants' conduct, the PLAINTIFF suffered loss of liberty, interruption of protected religious speech, chilling of constitutional rights, humiliation, emotional distress, property damage, criminal prosecution, and other damages.

158. By the foregoing acts and omissions, Defendants violated the PLAINTIFF'S rights under the First Amendment to be free from government-imposed suppression of speech based on audience hostility, crowd reaction, or a heckler's veto.

159. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

### THIRD CAUSE OF ACTION
### AGAINST
### DEFENDANTS ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, AND TYSON
### FIRST AMENDMENT VIEWPOINT DISCRIMINATION
### 42 U.S.C. § 1983

160. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "159", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

161. The Plaintiff was engaged in protected religious speech in a traditional public forum on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street during the Pride Parade.

162. The PLAINTIFF's speech was religious in nature and expressed a constitutionally protected viewpoint.

163. The First Amendment prohibits government officials from targeting, burdening, restricting, or punishing speech because of the speaker's viewpoint.

164. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the First Amendment viewpoint discriminatory

action against to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

a) knew that the PLAINTIFF was engaged in religious expression.

b) described by Defendant FORD, the PLAINTIFF as a "religious fella" who had the crowd "fired up," or words to that effect, showing that Defendants understood the nature and viewpoint of the PLAINTIFF's speech.

c) knew that members of the crowd and parade attendees were reacting negatively to the PLAINTIFF's religious message.

d) knew that the PLAINTIFF was not the source of unlawful conduct, of which Defendant FORD acknowledged that the PLAINTIFF was "not doing anything wrong," or words to that effect.

e) Rather than protect the PLAINTIFF's right to express his religious viewpoint, Defendants treated the PLAINTIFF's message as the problem because parade attendees and onlookers disliked, opposed, mocked, or reacted negatively to it.

f) not restrict the hostile onlookers' vulgar, confrontational, or aggressive speech toward the PLAINTIFF in the same manner that they restricted the PLAINTIFF's religious speech.

g) observed onlookers get close to the PLAINTIFF, yell vulgar statements at him, threw beads and bottled water, smacked his phone out of his hand, damage his property, and falsely accuse him of assault.

h) Despite witnessing the hostile conduct of onlookers, Defendants focused their enforcement efforts on the PLAINTIFF and his religious message instead of addressing the crowd's conduct.

i) showed hostility or deliberate indifference toward the PLAINTIFF's religious viewpoint and favored the reaction of the crowd over the PLAINTIFF's constitutional rights by stating to complainers, "I'll see what I can do" in order to remove the PLAINTIFF.

j) discussed that the parade would not continue moving until the PLAINTIFF stopped talking or went away, and Defendants treated the PLAINTIFF's religious speech as the obstacle to be removed.

k) used an alleged bullhorn/amplification permit requirement as a means to restrict the PLAINTIFF's religious speech after they had already acknowledged that the PLAINTIFF was not doing anything wrong.

l) confronted the PLAINTIFF, in Defendant ROGOWSKI, about an alleged permit requirement, failed to identify a specific ordinance when asked, and admitted that he was not accusing the PLAINTIFF of a crime.

m) after the PLAINTIFF refused to stop exercising his protected rights and stated that he would continue using amplification, directed Defendant MUHAMMAD, in Defendant ROGOWSKI, to seize the PLAINTIFF's bullhorn.

n) then grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn, in Defendant MUHAMMAD, subsequently causing the PLAINTIFF to be shoved, seized, placed in handcuffs, confined in a police vehicle, transported against his will, and issued an appearance ticket.

165. Defendants' actions were not viewpoint neutral because Defendants targeted the PLAINTIFF's religious message after the crowd reacted negatively to that message.

166. Defendants' actions burdened, restricted, chilled, and punished the PLAINTIFF's religious viewpoint in violation of the First Amendment.

167. Defendants ROGOWSKI, MUHAMMAD, and MYERS directly participated in the seizure, restriction, and arrest of the PLAINTIFF.

168. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in, encouraged, approved, assisted, or failed to stop the viewpoint-based suppression of the PLAINTIFF's protected speech despite having knowledge of the constitutional violation and a realistic opportunity to intervene.

169. Defendants acted under color of state law and intentionally, knowingly, or recklessly deprived the PLAINTIFF of his rights under the First Amendment.

170. As a direct and proximate result of Defendants' viewpoint discrimination, the PLAINTIFF suffered interruption of religious speech, chilling of constitutional rights, loss of liberty, humiliation, emotional distress, property damage, criminal prosecution, and other damages.

171. By the foregoing acts and omissions, Defendants violated the PLAINTIFF's right to be free from viewpoint discrimination under the First Amendment to the United States Constitution.

172. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## FOURTH CAUSE OF ACTION
## AGAINST
## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON:
## FIRST AMENDMENT PRIOR RESTRAINT/ UNLAWFUL PERMIT
## ENFORCEMENT
## 42 U.S.C. § 1983

173. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "172", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

174. The Plaintiff was engaged in protected religious speech in a traditional public forum on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street during the Pride Parade.

175. The PLAINTIFF used a bullhorn/amplification device as part of his religious street preaching.

176. The use of amplification for public speech is protected by the First Amendment, subject only to lawful, content-neutral, narrowly tailored, and properly applied time, place, and manner restrictions.

177. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing prior restraint against the First Amendment by way of enforcing and unlawful permit requirement against the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

    a) knew that the PLAINTIFF was engaged in protected speech.

    b) knew before Defendant ROGOWSKI arrived, Defendant FORD acknowledged that the PLAINTIFF was "not doing anything wrong," or words to that effect.

    c) acknowledged that the crowd and onlookers were reacting to the PLAINTIFF's speech and that the parade would not move unless the PLAINTIFF stopped talking or went away.

    d) knew After realizing that they had no lawful basis to remove the PLAINTIFF merely because of the crowd's reaction to his religious speech, Defendants pivoted to an alleged bullhorn/amplification permit theory.

    e) confronted, in Defendant ROGOWSKI, the PLAINTIFF and asked whether the PLAINTIFF had a permit to use amplification in the City of Buffalo of which then created a false narrative in Defendant ROGOWSKI, claiming that he checked with the offices of "Permit and Inspections" and that he was told the PLAINTIFF needed a permit to use a bullhorn, even though local government offices were closed at the time of the parade.

f) when the PLAINTIFF asked Defendant ROGOWSKI what law required such a permit, Defendant ROGOWSKI failed to identify a specific law, code section, ordinance number, or objective legal standard, of which Defendant ROGOWSKI instead stated only that it was a "city ordinance," or words to that effect., further stating in Defendant ROGOWSKI, that he was not accusing the PLAINTIFF of a crime.

g) Despite admitting that he (Defendant ROGOWSKI) was not accusing the PLAINTIFF of a crime, Defendant ROGOWSKI told the PLAINTIFF that he would not be allowed to use amplification.

h) an unidentified and unsupported permit requirement acted as a prior restraint on the PLAINTIFF's protected speech.

i) not provide the PLAINTIFF with any written ordinance, permit rule, lawful order, objective standard, warning citation, or constitutionally valid basis before restricting the PLAINTIFF's amplified speech.

j) not apply the alleged permit requirement in a neutral manner but instead used it after the crowd reacted negatively to the PLAINTIFF's religious speech and after Defendants discussed that the PLAINTIFF needed to stop talking or go away.

k) knew that the alleged permit enforcement was not narrowly tailored to any legitimate governmental interest because Defendants knew the PLAINTIFF was not doing anything wrong and knew that the crowd, not the PLAINTIFF, was creating the disturbance.

l) knew that the alleged permit enforcement was not content neutral or viewpoint neutral as applied because Defendants used it specifically against the

PLAINTIFF after identifying him as a religious speaker whose message had caused a reaction from the crowd.

m) knew that the alleged permit enforcement burdened substantially more speech than necessary because Defendants used it to stop the PLAINTIFF's religious speech instead of using less speech-restrictive means, including crowd control, separation, de-escalation, or protection of the PLAINTIFF from hostile onlookers.

n) After the PLAINTIFF informed Defendant ROGOWSKI that he would continue using amplification, Defendant ROGOWSKI ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

o) in Defendant MUHAMMAD then grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn causing the PLAINTIFF to be shoved, seized, stripped of his bullhorn, placed in handcuffs, confined in a police vehicle, transported against his will, searched, issued an appearance ticket, charged, and prosecuted.

178. Defendants ROGOWSKI and MUHAMMAD directly enforced the unlawful permit restriction against the PLAINTIFF.

179. Defendant MYERS directly participated in the seizure and arrest of the PLAINTIFF after the unlawful permit enforcement was imposed.

180. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in, encouraged, approved, assisted, or failed to stop the unlawful permit enforcement despite knowing that the PLAINTIFF was engaged in protected speech and despite having a realistic opportunity to intervene.

181. Defendants' conduct chilled, burdened, restricted, and punished the PLAINTIFF's protected speech.

182. Defendants acted under color of state law and intentionally, knowingly, or recklessly deprived the PLAINTIFF of his rights under the First Amendment.

183. As a direct and proximate result of Defendants' unlawful prior restraint and permit enforcement, the PLAINTIFF suffered interruption of religious speech, chilling of constitutional rights, loss of liberty, humiliation, emotional distress, property damage, criminal prosecution, and other damages.

184. By the foregoing acts and omissions, Defendants violated the PLAINTIFF's right to be free from unlawful prior restraints, unlawful permit enforcement, and unconstitutional restrictions on protected speech under the First Amendment to the United States Constitution.

185. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## FIFTH CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, AND TYSON:
## FIRST AMENDMENT FREE EXERCISE INTERFERENCE
## 42 U.S.C. § 1983

186. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "185", all inclusive of this

Complaint, with the same force and effect as though the same were more fully set forth herein.

187. The PLAINTIFF was engaged in religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

188. The PLAINTIFF's street preaching was not merely expressive conduct but was also part of the PLAINTIFF's sincere religious exercise.

189. The PLAINTIFF's religious exercise included publicly preaching, proclaiming his religious message, using amplification to communicate that message, and continuing to preach despite opposition from persons who disagreed with him.

190. Defendants ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON knew that the PLAINTIFF was engaged in religious exercise.

191. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the interference of the free exercise of the PLAINTIFF'S the First Amendment right against the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

a) described in Defendant FORD, that the PLAINTIFF as a "religious fella" who had the crowd "fired up," or words to that effect, showing that Defendants understood the religious nature of the PLAINTIFF's activity.

b) knew that the PLAINTIFF was not committing a crime or otherwise engaging in unlawful conduct, of which Defendant FORD acknowledged that the PLAINTIFF was "not doing anything wrong," or words to that effect.

c) Despite knowing that the PLAINTIFF was engaged in religious exercise and was not doing anything wrong, Defendants burdened the PLAINTIFF's religious exercise by attempting to stop, restrict, move, silence, seize, arrest, and prosecute him.

d) did not apply their authority in a neutral manner toward the PLAINTIFF's religious exercise.

e) treated the PLAINTIFF's religious preaching as the problem because it caused disagreement, anger, confrontation, or reaction from parade attendees and onlookers.

f) witnessed onlookers confront the PLAINTIFF, get close to his face, use vulgar statements toward him, throw objects or beads, smack his phone out of his hand, damage his property, and falsely accuse him of assault, rather than protecting the PLAINTIFF's religious exercise from hostile onlookers.

g) focused their actions on stopping or removing the PLAINTIFF, while discussing that the parade would not move until the PLAINTIFF stopped talking or went away, thereby treating the PLAINTIFF's religious exercise as the obstacle to be removed.

h) shifted to an alleged bullhorn/amplification permit theory as a means to restrict the PLAINTIFF's religious preaching.

i) confronted the PLAINTIFF, in Defendant ROGOWSKI about an alleged permit requirement for amplification and failed to identify a specific law, code section, or ordinance number, or objective legal standard when the PLAINTIFF asked what law required such a permit.

j) admitted, in Defendant ROGOWSKI, that he was not accusing the PLAINTIFF of a crime, yet still told the PLAINTIFF that he would not be allowed to use amplification.

k) after the PLAINTIFF refused to stop exercising his religious rights and stated that he would continue using amplification, Defendant ROGOWSKI ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

l) Defendant MUHAMMAD then grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn.

m) shoved the PLAINTIFF, then had him seized, stripped of his bullhorn, placed in handcuffs, confined in a police vehicle, transported against his will, searched, issued an appearance ticket, charged, and prosecuted.

192. Defendants' actions substantially burdened the PLAINTIFF's religious exercise by interrupting his preaching, preventing him from continuing his religious message with amplification, physically removing him from the location, restraining his liberty, damaging his religious preaching equipment, and subjecting him to prosecution.

193. Defendants' actions were not neutral or generally applicable as applied to the PLAINTIFF because they targeted the PLAINTIFF's religious exercise after identifying his religious message as the source of crowd reaction.

194. Defendants had less restrictive alternatives available, including controlling the crowd, protecting the PLAINTIFF from hostile onlookers, separating aggressive individuals from the PLAINTIFF, or allowing the PLAINTIFF to continue preaching from the public sidewalk without unlawful interference.

195. Defendants did not pursue those less restrictive alternatives and instead burdened the PLAINTIFF's religious exercise.

196. Defendants ROGOWSKI and MUHAMMAD directly participated in burdening the PLAINTIFF's religious exercise by enforcing the alleged permit restriction, seizing the bullhorn, and causing the PLAINTIFF's seizure and arrest.

197. Defendant MYERS directly participated in the PLAINTIFF's seizure and arrest.

198. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in, encouraged, approved, assisted, or failed to stop the burden on the PLAINTIFF's religious exercise despite knowing that the PLAINTIFF was engaged in protected religious activity and despite having a realistic opportunity to intervene.

199. Defendants acted under color of state law and intentionally, knowingly, or recklessly deprived the PLAINTIFF of his rights under the Free Exercise Clause of the First Amendment.

200. As a direct and proximate result of Defendants' interference with the PLAINTIFF's free exercise of religion, the PLAINTIFF suffered interruption of religious exercise, chilling of constitutional rights, loss of liberty, humiliation, emotional distress, property damage, criminal prosecution, and other damages.

201. By the foregoing acts and omissions, Defendants violated the PLAINTIFF's right to freely exercise his religion under the First Amendment to the United States Constitution.

202. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

**SIXTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO,**

**and TYSON**

**FOURTH AMENDMENT FALSE ARREST/ UNLAWFUL SEIZURE**

## 42 U.S.C. § 1983

203. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "202", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

204. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable seizure, false arrest, and arrest without probable cause.

205. That on June 4, 2023, the PLAINTIFF was engaged in religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

206. The PLAINTIFF did not commit a crime, did not threaten anyone, did not assault anyone, did not incite violence, and did not engage in conduct that supplied probable cause for his arrest.

207. Defendants ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON knew that the PLAINTIFF was engaged in lawful activity.

208. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the unreasonable seizure and false arrest without probable cause against the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

a) Acknowledged, in Defendant FORD that the PLAINTIFF was "not doing anything wrong," or words to that effect, of which Defendant ROGOWSKI later admitted to the PLAINTIFF that he was not accusing the PLAINTIFF of a crime.

b) Despite the absence of probable cause, Defendants ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON caused, participated in, assisted, or failed to stop the unlawful seizure and arrest of the PLAINTIFF.

c) confronted the PLAINTIFF, in Defendant ROGOWSKI about an alleged permit requirement for amplification.

d) When the PLAINTIFF asked Defendant ROGOWSKI what law or ordinance allegedly required such a permit, Defendant ROGOWSKI failed to identify a specific ordinance, code section, statute, or lawful authority.

e) stated, in Defendant ROGOWSKI, that it was only a "city ordinance," or words to that effect.

f) admitted, in Defendant ROGOWSKI, that he was not accusing the PLAINTIFF of a crime.

g) after the PLAINTIFF informed Defendant ROGOWSKI that he would continue using amplification, Defendant ROGOWSKI then ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

    h)  Defendant MUHAMMAD grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn.

    i)  shoved the PLAINTIFF into the street, then stripped of his bullhorn, placed in him handcuffs, then taken into custody by Defendants MUHAMMAD and MYERS, and confined in a police cruiser.

209. The PLAINTIFF was not free to leave.

210. The PLAINTIFF's liberty was restrained by physical force, show of authority, handcuffs, confinement in a police vehicle, transportation against his will, and the issuance of an appearance ticket.

211. The PLAINTIFF remained confined inside a police cruiser for over an hour in hot weather without air conditioning until the parade concluded.

212. The PLAINTIFF was then transported against his will outside the Erie County Holding Center where booking is located.

213. The PLAINTIFF was released only after being searched, returned to the area of Elmwood Avenue and Allen Street, and issued an appearance ticket.

214. The PLAINTIFF was charged and prosecuted, and all charges were later dropped and dismissed in his favor in February 2026.

215. At no time did Defendants possess probable cause to believe that the PLAINTIFF had committed a crime.

216. At no time did Defendants possess lawful authority to seize, arrest, confine, transport, or issue criminal process against the PLAINTIFF based on his protected religious speech or his use of amplification.

217. The alleged bullhorn/amplification permit theory did not provide probable cause because Defendants failed to identify a specific law, failed to identify an objective violation, and admitted that the PLAINTIFF was not being accused of a crime.

218. Defendants' own statements showed that they knew the PLAINTIFF was not committing wrongdoing, and that the real issue was the crowd's reaction to the PLAINTIFF's protected speech.

219. Defendant ROGOWSKI directly caused the unlawful seizure and arrest by directing Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn and by initiating the enforcement action against the PLAINTIFF.

220. Defendant MUHAMMAD directly participated in the unlawful seizure and arrest by grabbing and damaging the PLAINTIFF's bullhorn and physically participating in taking the PLAINTIFF into custody.

221. Defendant MYERS directly participated in the unlawful seizure and arrest by taking the PLAINTIFF into custody and placing or assisting in placing the PLAINTIFF in handcuffs.

222. Defendants FORD, DOYLE, FERRO, and TYSON personally participated in, encouraged, approved, assisted, or failed to stop the unlawful seizure and arrest despite knowing that the PLAINTIFF was engaged in protected activity and despite having a realistic opportunity to intervene.

223. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

224. As a direct and proximate result of Defendants' false arrest and unlawful seizure, the PLAINTIFF suffered loss of liberty, physical restraint, confinement, humiliation, emotional distress, interruption of protected religious speech, property damage, criminal prosecution, and other damages.

225. By the foregoing acts and omissions, Defendants violated the PLAINTIFF's right to be free from false arrest and unreasonable seizure under the Fourth Amendment to the United States Constitution.

226. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### AGAINST
### DEFENDANTS
### ROGOWSKI, MUHAMMAD, MYERS, and FERRO
### FOURTH AMENDMENT EXCESSIVE FORCE
### 42 U.S.C. § 1983

227. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "226", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

228. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable, unnecessary, and excessive force during a seizure or arrest.

229. That on June 4, 2023, the PLAINTIFF was engaged in religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

230. The PLAINTIFF was not threatening Defendants, was not assaulting anyone, was not attempting to flee, was not armed, and was not committing a violent offense.

231. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, AND FERRO, while acting in concert, under the color of law, authorizing, directing and/or causing the excessive force without probable cause against the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants ROGOWSKI, MYERS, MUHAMMAD, AND FERRO had:

   a) prior to the physical seizure of the PLAINTIFF, acknowledged that the PLAINTIFF was not doing anything wrong, and Defendant ROGOWSKI admitted that he was not accusing the PLAINTIFF of a crime.

   b) Despite the absence of any immediate threat, Defendant ROGOWSKI ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

   c) Defendant MUHAMMAD then grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn while the PLAINTIFF was using or possessing the bullhorn as part of his protected religious speech.

d) physically seized the PLAINTIFF, shoved the PLAINTIFF into the street, stripped the PLAINTIFF of his bullhorn, placed the PLAINTIFF in handcuffs, and took the PLAINTIFF into custody as the crowd cheered.

e) directly participated, in Defendant MUHAMMAD in the use of force by seizing, grabbing, tugging, bending, and damaging the PLAINTIFF's bullhorn and by physically participating in taking the PLAINTIFF into custody.

f) Defendant MYERS directly participated in the physical seizure, restraint, handcuffing, removal, and taking of the PLAINTIFF into custody.

g) Defendant FERRO directly participated in the physical seizure, restraint, handcuffing, removal, and taking of the PLAINTIFF into custody.

h) Defendant ROGOWSKI caused, directed, and set in motion the use of force by ordering Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn and by initiating the physical enforcement action against the PLAINTIFF.

i) used force against the PLAINTIFF, which was unreasonable under the circumstances because the PLAINTIFF posed no immediate threat to officer safety, posed no immediate threat to the public, was not resisting a lawful arrest, was not attempting to flee, and was engaged in protected religious speech.

j) used force against the PLAINTIFF, which was also unreasonable because Defendants had less intrusive alternatives available, including identifying a specific ordinance, issuing a warning, issuing a summons without physical force, allowing the PLAINTIFF to continue preaching, or using crowd-control measures against hostile onlookers.

k)  use of physical force was not reasonably necessary to accomplish any legitimate law-enforcement objective.

l)  use of force, which was especially unreasonable because the force followed Defendants' efforts to stop the PLAINTIFF's protected speech and enforce an unidentified bullhorn/amplification permit requirement.

m) knew, or reasonably should have known, that using physical force against the PLAINTIFF under these circumstances was excessive, unnecessary, and objectively unreasonable.

232. As a direct and proximate result of Defendants' excessive force, the PLAINTIFF suffered physical restraint, loss of liberty, humiliation, emotional distress, fear, interruption of protected religious speech, property damage, criminal prosecution, and other damages.

233. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the Fourth Amendment.

234. By the foregoing acts and omissions, Defendants ROGOWSKI, MUHAMMAD, MYERS, and FERRO violated the PLAINTIFF's right to be free from excessive force under the Fourth Amendment to the United States Constitution.

235. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

EIGHTH CAUSE OF ACTION

AGAINST

DEFENDANTS

ROGOWSKI AND MUHAMMAD

FOURTH AMENDMENT UNREASONABLE

SEARCH AND SEIZURE OF PROPERTY

42 U.S.C. § 1983

236. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "235", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

237. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable searches and seizures of his personal property.

238. On June 4, 2023, the PLAINTIFF possessed personal property, including his bullhorn, backpack, and other personal effects, while engaged in religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

239. The PLAINTIFF's bullhorn was used as part of the PLAINTIFF's protected religious speech and expressive activity.

240. That the conduct and actions of Defendants, ROGOWSKI and MUHAMMAD, acting in concert, under the color of law, authorizing, directing and/or causing the unreasonable search and seizure of the PLAINTIFF property, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants ROGOWSKI and MUHAMMAD had:

a) confronted (Defendant ROGOWSKI) confronted the PLAINTIFF about an alleged bullhorn/amplification permit requirement.

b) When the PLAINTIFF asked Defendant ROGOWSKI to identify the law, ordinance, or legal authority requiring such a permit, Defendant ROGOWSKI failed to identify a specific ordinance, section code, statute, or lawful authority.

c) admitted (Defendant ROGOWSKI) that he was not accusing the PLAINTIFF of a crime.

d) Despite admitting that he was not accusing the PLAINTIFF of a crime, Defendant ROGOWSKI ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

e) Defendant MUHAMMAD then grabbed, tugged, bent, and damaged the PLAINTIFF's bullhorn.

241. The seizure of the PLAINTIFF's bullhorn was unreasonable because Defendants lacked probable cause, a warrant, consent, exigent circumstances, or any lawful basis to seize or damage the PLAINTIFF's property.

242. The seizure of the PLAINTIFF's bullhorn was also unreasonable because it directly interfered with the PLAINTIFF's protected religious speech and occurred after Defendant ROGOWSKI failed to identify any specific legal authority prohibiting the PLAINTIFF's use of amplification.

243. The bullhorn was not contraband, evidence of a crime, or a weapon, nor was the bullhorn presenting an immediate threat to officer safety or public safety.

244. Defendants seized the PLAINTIFF's bullhorn as part of their effort to stop, restrict, and punish the PLAINTIFF's protected religious speech.

245. After the PLAINTIFF was taken into custody and transported, Defendant ROGOWSKI searched through the PLAINTIFF's backpack.

246. Defendant ROGOWSKI searched the PLAINTIFF's backpack without a warrant, without the PLAINTIFF's consent, without probable cause, and without a lawful exception to the warrant requirement, had seized and held the PLAINTIFF's bullhorn and phone for over two years without any warrant nor justification to hold such property.

247. Defendant ROGOWSKI's search of the PLAINTIFF's backpack was unreasonable because the PLAINTIFF was not lawfully arrested, was not being booked into the Erie County Holding Center and was ultimately released on an appearance ticket.

248. Defendant ROGOWSKI's search of the PLAINTIFF's backpack exceeded any lawful need for officer safety, inventory, or evidence preservation.

249. Defendant ROGOWSKI's search and Defendant MUHAMMAD's seizure of the bullhorn were not objectively reasonable under the circumstances.

250. Defendants ROGOWSKI and MUHAMMAD acted intentionally, knowingly, recklessly, or with deliberate indifference to the PLAINTIFF's Fourth Amendment rights.

251. As a direct and proximate result of Defendants' unlawful search and seizure of property, the PLAINTIFF suffered deprivation of property, damage to property, interruption of protected religious speech, humiliation, emotional distress, loss of liberty, criminal prosecution, and other damages.

252. By the foregoing acts and omissions, Defendants ROGOWSKI and MUHAMMAD violated the PLAINTIFF's right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

253. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

**NINTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO,**

**and TYSON**

**FAILURE TO INTERVENE**

**42 U.S.C. § 1983**

254. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "253", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

255. At all relevant times, Defendants FORD, DOYLE, TYSON, FERRO, MYERS, MUHAMMAD, and ROGOWSKI had a duty to intervene when they observed, or had

reason to know, that other officers were violating the PLAINTIFF's constitutional rights.

256. On June 4, 2023, the PLAINTIFF was engaged in protected religious speech on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

257. The PLAINTIFF did not commit a crime, did not threaten anyone, did not assault anyone, did not incite violence, and did not engage in conduct that supplied probable cause for his arrest.

258. Defendants ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON knew that the PLAINTIFF was engaged in lawful activity.

259. That the conduct and actions of Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON, while acting in concert, under the color of law, authorizing, directing and/or causing the failure of intervening the prevention of constitutional violations that caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON had:

   a) knew that the PLAINTIFF was engaged in protected speech and that the crowd and onlookers were reacting to the PLAINTIFF's message.

   b) acknowledged (Defendant FORD) that the PLAINTIFF was "not doing anything wrong," or words to that effect.

c) huddled together and discussed the situation involving the PLAINTIFF, the crowd, the parade, and whether the PLAINTIFF could lawfully be removed.

d) stated words to the effect (Defendant FORD) that the parade was not moving because people were engaging the PLAINTIFF, that the people were giving him (PLAINTIFF) a hard time, despite that everyone was safe, and that he (Defendant FORD) was trying to get the parade moving.

e) stated words to the effect (Defendant FORD) that the PLAINTIFF was "not doing anything wrong," but that the PLAINTIFF needed to stop talking for a minute or go away before the parade would move.

f) observed onlookers harassing the PLAINTIFF, getting close to the PLAINTIFF, making vulgar statements toward him, throwing beads, and escalating the situation.

g) acknowledged that it may come to a point where officers would have to protect the PLAINTIFF, that Defendant DOYLE acknowledged that officers may have to protect the PLAINTIFF because onlookers were "all up in his face," or words to that effect.

h) witnessed a female onlooker go behind the PLAINTIFF and smack the PLAINTIFF's phone out of his hand, damaging it.

i) witnessed a male onlooker falsely accuse the PLAINTIFF of assault as Defendant MUHAMMAD corrected the male onlooker's false accusation by stating words to the effect that the PLAINTIFF had been pushed and that the female onlooker had smacked the PLAINTIFF's phone out of his hand.

j)  despite knowing that the PLAINTIFF was not the aggressor and was not committing wrongdoing, Defendants failed to intervene to protect the PLAINTIFF's speech and liberty from unconstitutional interference.

k)  failed to intervene when the focus shifted from controlling the hostile crowd to removing the PLAINTIFF.

l)  later confronted (Defendant ROGOWSKI) the PLAINTIFF about an alleged bullhorn/amplification permit requirement.

m)  When the PLAINTIFF asked Defendant ROGOWSKI to identify the specific law or ordinance requiring such a permit, Defendant ROGOWSKI failed to identify a specific ordinance, code section, statute, or lawful authority.

n)  Defendant ROGOWSKI admitted that he was not accusing the PLAINTIFF of a crime.

o)  despite this admission, Defendant ROGOWSKI told the PLAINTIFF that he would not be allowed to use amplification and then ordered Defendant MUHAMMAD to seize the PLAINTIFF's bullhorn.

p)  allowed Defendant MUHAMMAD of which he seized, tugged, bent, and damaged the PLAINTIFF's bullhorn.

q)  after physically seizing the PLAINTIFF, shoved the PLAINTIFF into the street, stripped the PLAINTIFF of his bullhorn, placed the PLAINTIFF in handcuffs, and took the PLAINTIFF into custody as the crowd cheered on.

r)  realistic opportunity to intervene before the PLAINTIFF was seized, before the PLAINTIFF's bullhorn was taken and damaged, before the PLAINTIFF was

handcuffed, before the PLAINTIFF was confined in a police vehicle, and before the PLAINTIFF was transported and issued an appearance ticket.

s)   failed to take reasonable steps to prevent or stop the violations, including but not limited to correcting the unlawful enforcement action, preventing the seizure of the bullhorn, preventing the physical seizure of the PLAINTIFF, preventing the handcuffing of the PLAINTIFF, preventing the confinement and transport of the PLAINTIFF, or protecting the PLAINTIFF from unlawful retaliation and suppression of speech.

t)   knew, or reasonably should have known, that the PLAINTIFF's First Amendment rights were being violated because the PLAINTIFF was being targeted for protected religious speech, crowd reaction, viewpoint-based hostility, and refusal to stop preaching.

u)   knew, or reasonably should have known, that the PLAINTIFF's Fourth Amendment rights were being violated because the PLAINTIFF was seized, physically restrained, handcuffed, confined, and transported without probable cause or lawful justification.

260. Defendants' failure to intervene allowed the unconstitutional conduct to continue and directly contributed to the PLAINTIFF's injuries to the extent any Defendant did not personally apply force, personally seize property, personally place handcuffs on the PLAINTIFF, personally search property, or personally initiate the charges, that Defendant is liable because he or she observed the violations, had reason to know the violations were occurring, had a realistic opportunity to stop them, and failed to intervene.

261. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the First and Fourth Amendments.

262. As a direct and proximate result of Defendants' failure to intervene, the PLAINTIFF suffered interruption of protected religious speech, chilling of constitutional rights, loss of liberty, physical restraint, humiliation, emotional distress, property damage, criminal prosecution, and other damages.

263. By the foregoing acts and omissions, Defendants violated the PLAINTIFF's constitutional rights by failing to intervene to prevent the violation of the PLAINTIFF's First and Fourth Amendment rights.

264. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

**TENTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANT**

**ROGOWSKI**

**MALICIOUS PROSECUTION**

**42 U.S.C. § 1983**

265. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "264", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

266. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from malicious prosecution, unreasonable seizure, and criminal prosecution initiated without probable cause.

267. On June 4, 2023, the PLAINTIFF was engaged in protected religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

268. The PLAINTIFF did not commit disorderly conduct, did not resist arrest, did not obstruct governmental administration, did not threaten anyone, did not incite violence, and did not engage in conduct that supplied probable cause for criminal prosecution.

269. The PLAINTIFF did not commit a crime, did not threaten anyone, did not assault anyone, did not incite violence, and did not engage in conduct that supplied probable cause for his arrest.

270. Defendant ROGOWSKI knew that the PLAINTIFF was engaged in lawful activity.

271. That the conduct and actions of Defendant ROGOWSKI, while acting in concert, under the color of law, authorizing, directing and/or causing malicious prosecution that caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in his official capacity prior to him waving his qualified immunity, of which Defendant ROGOWSKI had:

a) knew, or reasonably should have known, that the PLAINTIFF had not committed any crime.

b) admitted to the PLAINTIFF that he was not accusing the PLAINTIFF of a crime.

c)  despite admitting that he was not accusing the PLAINTIFF of a crime, then ROGOWSKI caused the PLAINTIFF to be seized, arrested, charged, and prosecuted.

d)  initiated criminal proceedings against the PLAINTIFF by submitting three accusatory instruments against the PLAINTIFF.

e)  charged the PLAINTIFF with **DISORDERLY CONDUCT under New York Penal Law § 240.20, RESISTING ARREST under New York Penal Law § 205.30, and OBSTRUCTING GOVERNMENTAL ADMINISTRATION under New York Penal Law § 195.05**.

f)  knew or should have known that the criminal charges were not supported by probable cause.

g)  lacked probable cause to charge the PLAINTIFF with disorderly conduct because the PLAINTIFF was engaged in protected religious speech, was standing on or near a public sidewalk/public corner and was not the source of unlawful conduct.

h)  lacked probable cause to charge the PLAINTIFF with resisting arrest because the underlying arrest was unlawful, unsupported by probable cause, and caused by Defendants' unlawful interference with the PLAINTIFF's protected speech and amplification.

i)  lacked probable cause to charge the PLAINTIFF with obstructing governmental administration because the PLAINTIFF did not intentionally obstruct, impair, or

prevent the administration of law or governmental function, and Defendants had no lawful basis to restrict, seize, or arrest the PLAINTIFF.

j) knew that the crowd and onlookers were the source of the alleged disruption, not the PLAINTIFF.

k) knew, or reasonably should have known, that officers had previously acknowledged that the PLAINTIFF was not doing anything wrong.

l) knew, or reasonably should have known, that the alleged bullhorn/amplification permit theory did not provide a lawful basis to arrest or prosecute the PLAINTIFF where Defendant ROGOWSKI failed to identify a specific ordinance, code section, statute, or objective legal standard when asked.

m) acted with malice, retaliatory motive, or reckless disregard for the PLAINTIFF's rights by initiating charges against the PLAINTIFF after the PLAINTIFF refused to stop his protected religious speech, invoked the Constitution, recorded police conduct, and warned that unlawful conduct could result in civil liability.

n) Defendant ROGOWSKI's submission of accusatory instruments caused the PLAINTIFF to be subjected to criminal proceedings.

272. The criminal proceedings caused the PLAINTIFF to suffer a post-arraignment or prosecution-related deprivation of liberty, including but not limited to having to appear in court, defend himself against criminal accusations, face restrictions and burdens associated with pending criminal charges, and endure the threat of conviction and punishment.

273. The criminal proceedings were terminated in the PLAINTIFF's favor when all charges were dropped and dismissed in February 2026.

274. The favorable termination of the charges confirms that the criminal prosecution ended without a conviction against the PLAINTIFF.

275. Defendant ROGOWSKI's actions were intentional, malicious, retaliatory, objectively unreasonable, and undertaken under color of state law.

276. As a direct and proximate result of Defendant ROGOWSKI's malicious prosecution, the PLAINTIFF suffered loss of liberty, humiliation, emotional distress, reputational harm, interruption and chilling of constitutional rights, costs and burdens of defending against criminal charges, and other damages.

277. By the foregoing acts and omissions, Defendant ROGOWSKI violated the PLAINTIFF's rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

278. The PLAINTIFF is entitled to compensatory damages, punitive damages against Defendant ROGOWSKI, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
## AGAINST
## DEFENDANT
## ROGOWSKI
## MALICIOUS PROSECUTION
## UNDER NEW YORK STATE LAW CLAIM

279. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "278", all inclusive of this

Complaint, with the same force and effect as though the same were more fully set forth herein.

280. At all relevant times, the PLAINTIFF had the right under New York law to be free from criminal prosecution initiated without probable cause and with malice.

281. On June 4, 2023, the PLAINTIFF was engaged in religious street preaching on or near the public sidewalk/public corner of Elmwood Avenue and Allen Street in the City of Buffalo.

282. The PLAINTIFF did not commit DISORDERLY CONDUCT, did not commit RESISTING ARREST, did not commit OBSTRUCTING GOVERNMENTAL ADMINISTRATION, and did not commit any offense that supplied probable cause for criminal prosecution.

283. Defendant ROGOWSKI initiated criminal proceedings against the PLAINTIFF by submitting accusatory instruments against the PLAINTIFF.

284. Defendant ROGOWSKI charged the PLAINTIFF with **DISORDERLY CONDUCT under New York Penal Law § 240.20, RESISTING ARREST under New York Penal Law § 205.30**, and **OBSTRUCTING GOVERNMENTAL ADMINISTRATION under New York Penal Law § 195.05**.

285. Defendant ROGOWSKI knew that the PLAINTIFF was engaged in lawful activity.

286. That the conduct and actions of Defendant ROGOWSKI, while acting in concert, under the color of law, authorizing, directing and/or causing malicious prosecution that caused irreparable harm to the PLAINTIFF, without justification by the improper,

impermissible and unprofessional use of authority in his official capacity prior to him waving his qualified immunity, of which Defendant ROGOWSKI had:

a) lacked probable cause to initiate or continue those criminal charges against the PLAINTIFF.

b) lacked probable cause to charge the PLAINTIFF with DISORDERLY CONDUCT because the PLAINTIFF was engaged in protected religious speech, did not threaten anyone, did not assault anyone, did not incite violence, and did not create a lawful basis for criminal prosecution.

c) lacked probable cause to charge the PLAINTIFF with RESISTING ARREST because the arrest and seizure of the PLAINTIFF were unlawful, unsupported by probable cause, and caused by Defendants' unlawful interference with the PLAINTIFF's protected speech.

d) lacked probable cause to charge the PLAINTIFF with OBSTRUCTING GOVERNMENTAL ADMINISTRATION because the PLAINTIFF did not intentionally obstruct, impair, or prevent any lawful governmental function.

e) knew, or reasonably should have known, that the PLAINTIFF was not committing a crime.

f) admitted to the PLAINTIFF that he was not accusing the PLAINTIFF of a crime before causing the PLAINTIFF to be seized, arrested, charged, and prosecuted.

g) knew, or reasonably should have known, that the crowd and onlookers were the source of the alleged disruption, not the PLAINTIFF.

h) acted with actual malice, implied malice, retaliatory motive, or reckless disregard for the PLAINTIFF's rights when he initiated and caused criminal proceedings against the PLAINTIFF without probable cause.

287. Defendant ROGOWSKI's malice may be inferred from the lack of probable cause, the PLAINTIFF's protected speech, Defendant ROGOWSKI's failure to identify a lawful basis for the alleged bullhorn/amplification restriction, and Defendant ROGOWSKI's decision to submit criminal charges after the PLAINTIFF refused to surrender his constitutional rights.

288. The criminal proceedings terminated in the PLAINTIFF's favor when all charges were dropped and dismissed in February 2026.

289. The favorable termination of the criminal proceedings ended without a conviction against the PLAINTIFF.

290. As a direct and proximate result of Defendant ROGOWSKI's malicious prosecution, the PLAINTIFF suffered humiliation, emotional distress, reputational harm, fear, anxiety, interruption and chilling of constitutional rights, court appearances, the burden of defending against criminal accusations, and other damages.

291. Defendant ROGOWSKI's conduct was intentional, malicious, reckless, and without legal justification.

292. By the foregoing acts and omissions, Defendant ROGOWSKI committed malicious prosecution under New York law.

293. The PLAINTIFF is entitled to compensatory damages, punitive damages where permitted, costs, and all other relief this Court deems just and proper.

**TWELFTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**GEHR, MORETTI, CARLSON, AND BRIDGE**

**FIRST AMENDMENT RETALIATION**

**42 U.S.C. § 1983**

294. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "293", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

295. At all relevant times, the PLAINTIFF had the right under the First Amendment to record police officers, criticize police officers, publish commentary regarding police conduct, operate a YouTube channel discussing police misconduct, and question officers regarding their conduct in a public place.

296. Prior to the incident of September 24, 2023, the PLAINTIFF engaged in protected First Amendment activity by recording police officers, publishing videos regarding police conduct, and criticizing Defendant MORETTI and Defendant GEHR regarding their unprofessionalism, lack of knowledge of the Constitution, and trespass laws.

297. On September 24, 2023, the PLAINTIFF again engaged in protected First Amendment activity by recording Defendants with his body camera and cellphone camera, questioning why Buffalo Police officers were observing his van, and asking whether he was being detained.

298. That the conduct and actions of Defendants GEHR, MORETTI, CARLSON, AND BRIDGE, while acting in concert, under the color of law, authorizing, directing and/or causing retaliation of the PLAINTIFF'S First Amendment rights, which caused

irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunity, of which Defendant GEHR, MORETTI, CARLSON, AND BRIDGE had:

a) knew, or reasonably should have known, that the PLAINTIFF was engaged in protected First Amendment activity.

b) stated words to the effect of (Defendant MORETTI), "Yeah, I know about his channel, we all watch his channel, we know what he does," while shaming the PLAINTIFF.

c) showed, in Defendant MORETTI's statement that, Defendants knew of the PLAINTIFF's protected First Amendment activity, including his YouTube channel and prior criticism of police officers.

d) knew, in Defendant GEHR, or reasonably should have known, that the PLAINTIFF had previously criticized him through protected speech on the PLAINTIFF's YouTube channel.

e) The PLAINTIFF's recording, questioning, criticism, and publication of videos regarding police conduct were substantial or motivating factors in Defendants' conduct toward the PLAINTIFF.

f) adverse actions included, but were not limited to, escalating the encounter, ordering the PLAINTIFF out of his van, going hands-on with the PLAINTIFF, seizing the PLAINTIFF's keys, threatening the PLAINTIFF with a taser, ripping the PLAINTIFF from his van, forcing the PLAINTIFF to the pavement, placing the PLAINTIFF in handcuffs, placing the PLAINTIFF inside a police cruiser,

towing the PLAINTIFF's van, grabbing the PLAINTIFF's body-worn camera, attempting to access or turn off the PLAINTIFF's body-worn camera, damaging the body-worn camera, taunting and shaming the PLAINTIFF, arresting the PLAINTIFF, and causing criminal charges and traffic tickets to be issued against him.

g) Defendants' attempt to access, interfere with, or turn off the PLAINTIFF's body-worn camera further supports retaliatory motive because the PLAINTIFF was known to record police officers, publish police-related content, and criticize police conduct on his YouTube channel.

h) Before Defendants escalated the encounter, Defendants informed the PLAINTIFF that he was not detained and that he was free to go.

i) knew, or should have known that after being told that the PLAINTIFF was not detained and was free to go, the PLAINTIFF walked to his parked van, unlocked it, and entered it to show that the van was not abandoned and that he had an interest in the property.

j) knew, or should have known that the van was parked, stationary, not running, not being operated, and not being driven at the time of the incident.

k) did not first, ask the PLAINTIFF for documentation, did not attempt to de-escalate, and did not reasonably investigate the PLAINTIFF's interest in the van before escalating the encounter.

l) inserted his arms (Defendant GEHR into the doorway area, prevented the PLAINTIFF from closing the door, and participated in the physical escalation against the PLAINTIFF.

m) Defendants CARLSON and BRIDGE rushed from their police cruiser and assisted Defendant GEHR in going hands-on with the PLAINTIFF.

n) One or more Defendants seized the PLAINTIFF's keys from his hand while the PLAINTIFF was pleading for Defendants to calm down and de-escalate.

o) One or more Defendants threatened the PLAINTIFF with a taser even though the PLAINTIFF informed Defendants that he was not a threat and that the use of a taser would not be reasonable.

p) ripped the PLAINTIFF from the van, forced him to the street pavement, placed him in handcuffs, and arrested him.

q) placed the PLAINTIFF inside Defendant GEHR's police cruiser and restrained the PLAINTIFF in a manner that caused unnecessary pain and pressure to his neck and back.

r) When the PLAINTIFF complained about the restraints, Defendants responded in a hostile and retaliatory manner.

s) Defendant MORETTI arrive on scene and fail to stop or correct the retaliatory conduct, despite having knowledge of the PLAINTIFF's complaints and circumstances.

t) Defendant MORETTI make statements regarding the PLAINTIFF's YouTube channel, together with the shaming, taunting, seizure, arrest, property interference, and prosecution of the PLAINTIFF, supports a reasonable inference that Defendants acted with retaliatory animus toward the PLAINTIFF's protected speech.

u) Defendants' conduct was not a neutral enforcement action, but was motivated, at least in part, by the PLAINTIFF's protected recording, criticism, publication, and questioning of police conduct.

v) Defendant GEHR further retaliate against the PLAINTIFF by submitting accusatory instruments and causing the PLAINTIFF to be charged and prosecuted after the PLAINTIFF had engaged in protected First Amendment activity.

w) chilled, burdened, punished, and deterred the PLAINTIFF's protected First Amendment activity.

299. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the First Amendment.

300. As a direct and proximate result of Defendants' retaliation, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of protected speech, damage to property, loss of use of property, towing and impound expenses, criminal prosecution, traffic tickets, and other damages.

301. By the foregoing acts and omissions, Defendants GEHR, MORETTI, CARLSON, and BRIDGE violated the PLAINTIFF's right to be free from retaliation for protected First Amendment activity.

302. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## GEHR, CARLSON, AND BRIDGE

## FOURTH AMENDMENT FALSE ARREST/ UNLAWFUL SEIZURE

## 42 U.S.C. § 1983

303. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "302", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

304. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable seizure, false arrest, and arrest without probable cause.

305. On Sunday, September 24, 2023, at approximately 11:04 p.m., the PLAINTIFF approached Defendants to understand why Buffalo Police officers were observing the PLAINTIFF's parked van near 376 DEARBORN STREET in the City of Buffalo.

306. The PLAINTIFF's van was parked, stationary, not running, not being operated, and not being driven at the time Defendants first observed it.

307. The PLAINTIFF approached Defendants while recording with his body-worn camera and cellphone camera.

308. The conduct and actions of Defendants GEHR, CARLSON, AND BRIDGE, while acting in concert, under the color of law, authorizing, directing and/or causing

unreasonable seizure, false arrest without probable cause, which caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunity, of which Defendant GEHR, CARLSON, AND BRIDGE had:

a) informed the PLAINTIFF that the matter was "police business," or words to that effect, and that the PLAINTIFF was free to go, of which the PLAINTIFF specifically asked whether he was being detained, the Defendants affirmed that he was not.

b) knew that the PLAINTIFF had an interest in the property which was his van.

c) knew the PLAINTIFF did not drive the van, did not operate the van, nor did not start the engine, did not attempt to flee, and did not use the van as a weapon.

d) elected not to ask the PLAINTIFF for documentation, without attempting to confirm ownership or lawful possession, and without attempting to de-escalate, Defendants suddenly ordered the PLAINTIFF to exit the van.

e) Defendant GEHR immediately insert his arms into the driver-side doorway area and physically blocked the PLAINTIFF from closing the door.

f) Defendants CARLSON and BRIDGE rushed from their police cruiser and assisted Defendant GEHR in physically seizing the PLAINTIFF, of which Defendants GEHR, CARLSON, and BRIDGE went hands-on with the PLAINTIFF, grabbed the PLAINTIFF's arms, and physically restrained the PLAINTIFF.

g) seized the PLAINTIFF's keys from his hand, while One or more Defendants opened the passenger-side front door and held the PLAINTIFF at taser point, threatening to tase the PLAINTIFF if he did not follow their commands.

h) The PLAINTIFF informed Defendants that he was not a threat and that use of a taser was not reasonable, so the Defendants then elected to shove, then pulled, and ripped the PLAINTIFF out of the van.

i) forced the PLAINTIFF to the street pavement in the prone position, when asked why they were doing this, they responded words to the effect of, "We don't recognize your plates, you are on public streets without registration, we are taking your car."

j) when the PLAINTIFF stated that he did not consent, Defendants then shouted "Stop resisting," or words to that effect, despite Defendants being the ones who escalated the encounter and physically seized the PLAINTIFF.

k) placed the PLAINTIFF in handcuffs without first informing the PLAINTIFF that he was under arrest.

l) when the PLAINTIFF asked why he was being handcuffed, one of the officers informed the PLAINTIFF that he was under arrest for "resisting arrest," or words to that effect.

m) lacked probable cause to arrest the PLAINTIFF for RESISTING ARREST because Defendants had no lawful basis to arrest or seize the PLAINTIFF before claiming that he resisted.

n) lacked probable cause to arrest the PLAINTIFF for OBSTRUCTING GOVERNMENTAL ADMINISTRATION because the PLAINTIFF did not intentionally obstruct, impair, or prevent any lawful governmental function.

o) lacked probable cause to arrest the PLAINTIFF for HARASSMENT because the PLAINTIFF did not intentionally strike, shove, kick, or subject Defendant GEHR or any other officer to unlawful physical contact.

p) lacked probable cause to arrest the PLAINTIFF for DISORDERLY CONDUCT because the PLAINTIFF did not engage in violent, tumultuous, threatening, or disorderly conduct, and any alleged disturbance was caused by Defendants' own escalation.

q) lacked probable cause to arrest the PLAINTIFF based on traffic-ticket allegations because the van was parked, stationary, not running, not being operated, and not being driven by the PLAINTIFF.

r) Even assuming Defendants believed some traffic or parking violation existed, such belief did not supply probable cause to forcibly seize, arrest, and criminally charge the PLAINTIFF under the circumstances.

s) placed the PLAINTIFF inside Defendant GEHR's police cruiser and was not free to leave.

t) took the PLAINTIFF into custody, booked, and released from booking the following afternoon.

u) initiated and caused criminal accusations (Defendant GEHR) against the PLAINTIFF after the unlawful seizure and arrest.

v) Defendant GEHR directly participated in the unlawful seizure and arrest by inserting his arms into the van doorway area, going hands-on with the PLAINTIFF, participating in the physical removal of the PLAINTIFF from the van, placing or assisting in placing the PLAINTIFF in custody, and later causing criminal charges to be filed.

w) Defendant CARLSON directly participated in the unlawful seizure and arrest by rushing to assist Defendant GEHR, going hands-on with the PLAINTIFF, physically restraining the PLAINTIFF, and assisting in removing and arresting the PLAINTIFF.

x) Defendant BRIDGE directly participated in the unlawful seizure and arrest by rushing to assist Defendant GEHR, going hands-on with the PLAINTIFF, physically restraining the PLAINTIFF, and assisting in removing and arresting the PLAINTIFF.

309. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

310. As a direct and proximate result of Defendants' false arrest and unlawful seizure, the PLAINTIFF suffered loss of liberty, physical restraint, confinement, humiliation, emotional distress, fear, reputational harm, interruption and chilling of constitutional rights, towing and impound expenses, criminal prosecution, traffic tickets, and other damages.

311. By the foregoing acts and omissions, Defendants GEHR, CARLSON, and BRIDGE violated the PLAINTIFF's right to be free from false arrest and unreasonable seizure under the Fourth Amendment to the United States Constitution.

312. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## GEHR, CARLSON, AND BRIDGE
## FOURTH AMENDMENT EXCESSIVE FORCE
## 42 U.S.C. § 1983

313. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "312", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

314. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable, unnecessary, and excessive force during a seizure or arrest.

315. On Sunday, September 24, 2023, at approximately 11:04 p.m., the PLAINTIFF approached Defendants while recording with his body-worn camera and cellphone camera to understand why Buffalo Police officers were observing the PLAINTIFF's parked van near 376 DEARBORN STREET in the City of Buffalo.

316. The PLAINTIFF's van was parked, stationary, not running, not being operated, and not being driven at the time Defendants first observed it.

317. Defendants told the PLAINTIFF that he was not detained and that he was free to go.

318. After being told that he was not detained and was free to go, the PLAINTIFF walked to his parked van, unlocked it, and entered it to show that the van was not abandoned and that the PLAINTIFF had an interest in the property.

319. The PLAINTIFF did not start the van, did not operate the van, did not drive the van, did not attempt to flee, and did not use the van as a weapon.

320. The conduct and actions of Defendants GEHR, CARLSON, AND BRIDGE, while acting in concert, under the color of law, authorizing, directing and/or causing unreasonable, unnecessary, and excessive force without probable cause, which caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunity, of which Defendant GEHR, CARLSON, AND BRIDGE had:

a) observed the PLAINTIFF's van was parked, stationary, not running, not being operated, and not being driven at the time.

b) told the PLAINTIFF that he was not detained and that he was free to go, while after informing him that he was not detained and was free to go, the PLAINTIFF walked to his parked van, unlocked it, and entered it to show that the van was not abandoned and that the PLAINTIFF had an interest in the property.

c) observe the PLAINTIFF not start the van, not operate the van, not drive the van, not attempt to flee, and did not use the van as a weapon.

d) without attempting to de-escalate, without asking the PLAINTIFF for documentation, and without warning the PLAINTIFF that he was under arrest,

Defendant GEHR inserted his arms into the driver-side doorway area and physically prevented the PLAINTIFF from closing the door.

e) Defendants CARLSON and BRIDGE rushed from their police cruiser and assisted Defendant GEHR in going hands-on with the PLAINTIFF.

f) Defendants GEHR, CARLSON, and BRIDGE grabbed the PLAINTIFF's arms and physically restrained the PLAINTIFF while the PLAINTIFF was pleading with Defendants to calm down and de-escalate.

g) snatched the PLAINTIFF's keys from his hand, afterwards having one or more Defendants opening the passenger-side front door and holding the PLAINTIFF at taser point, threatening to tase the PLAINTIFF if he did not follow their commands.

h) knew or should have known that the taser threat was unreasonable because the PLAINTIFF was not armed, was not threatening the Defendants, was not attempting to flee, was not using the van as a weapon, and was not committing a violent offense.

i) shoved, pulled, and ripped the PLAINTIFF out of the van then forced the PLAINTIFF to the street pavement in the prone position, placing the PLAINTIFF in handcuffs without first informing the PLAINTIFF that he was under arrest.

j) When the PLAINTIFF asked why he was being handcuffed, one of the officers informed the PLAINTIFF that he was under arrest for "resisting arrest," or words to that effect.

k) knew or should have known that such force used against the PLAINTIFF was unreasonable because Defendants created the physical confrontation by escalating against the PLAINTIFF after telling him that he was not detained and was free to go.

l) knew or should have known the force used against the PLAINTIFF was unreasonable because the PLAINTIFF posed no immediate threat to officer safety, posed no immediate threat to public safety, did not attempt to flee, and was not resisting a lawful arrest.

m) placed the PLAINTIFF inside Defendant GEHR's police cruiser while restrained.

n) Knowing that the PLAINTIFF was obese, Defendants single-cuffed the PLAINTIFF in a manner that tightened pressure on the PLAINTIFF's neck and back.

o) The PLAINTIFF complained to Defendants about the cuffs and the pressure being caused by the restraints, rather than immediately remedy the unreasonable restraint, Defendants responded words to the effect of, "You shouldn't have fought with us."

p) The delayed correction of the painful restraint further supports that the original manner of restraint was unreasonable and caused unnecessary pain that the Defendants' use of force was not reasonably necessary to accomplish any legitimate law-enforcement objective.

q) disregarded less intrusive alternatives available, including calmly asking for documentation, explaining the alleged basis for the tow, allowing the PLAINTIFF to show ownership or possession, issuing any appropriate ticket without physical force, contacting a supervisor, or de-escalating the encounter.

r) Defendant GEHR directly participated in the excessive force by inserting his arms into the doorway area, physically blocking the PLAINTIFF, going hands-on with the PLAINTIFF, participating in the removal of the PLAINTIFF from the van, participating in the handcuffing or restraint of the PLAINTIFF, and placing or assisting in placing the PLAINTIFF in custody.

s) Defendant CARLSON directly participated in the excessive force by rushing to assist Defendant GEHR, going hands-on with the PLAINTIFF, grabbing and restraining the PLAINTIFF, participating in the removal of the PLAINTIFF from the van, and assisting in the PLAINTIFF's arrest and restraint.

t) Defendant BRIDGE directly participated in the excessive force by rushing to assist Defendant GEHR, going hands-on with the PLAINTIFF, grabbing and restraining the PLAINTIFF, participating in the removal of the PLAINTIFF from the van, and assisting in the PLAINTIFF's arrest and restraint.

321. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

322. As a direct and proximate result of Defendants' excessive force, the PLAINTIFF suffered physical pain, pressure to his neck and back, loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, property interference, criminal prosecution, traffic tickets, and other damages.

323. By the foregoing acts and omissions, Defendants GEHR, CARLSON, and BRIDGE violated the PLAINTIFF's right to be free from excessive force under the Fourth Amendment to the United States Constitution.

324. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## GEHR, MORETTI, CARLSON, BRIDGE, AND MILLER
## FOURTH AMENDMENT UNLAWFUL SEIZURE OF
## PROPERTY/UNLAWFUL TOW
## 42 U.S.C. § 1983

325. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "324", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

326. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable seizures of his personal property, including his vehicle, keys, body-worn camera, and personal effects.

327. On Sunday, September 24, 2023, the PLAINTIFF's van was parked near 376 DEARBORN STREET in the City of Buffalo, while the PLAINTIFF's van was parked unabandoned, stationary, not running, not being operated, and not being driven, the PLAINTIFF appeared on scene, possessed keys to the van, unlocked the van, entered the van, and made clear through his conduct and statements that he had an interest in the van.

328. Prior to the PLAINTIFF entering his van, Defendants informed the PLAINTIFF that he was not detained and that he was free to go, of which the PLAINTIFF proceeded to walk toward his van, unlocking it, and entering it to show that the van was not abandoned and that the PLAINTIFF had an interest in his property.

329. The ensuing conduct and actions of Defendants GEHR, MORETTI, CARLSON, MILLER, AND BRIDGE, while acting in concert, under the color of law, authorizing, directing and/or causing the unlawful seizure and towing of the PLAINTIFF's vehicle and other property, violated the PLAINTIFF'S Fourth Amendment rights, which caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunity, of which Defendant GEHR, MORETTI, CARLSON, MILLER, AND BRIDGE had:

a) not first ask the PLAINTIFF for documentation, did not attempt to confirm ownership or lawful possession, and did not use less intrusive means before seizing the PLAINTIFF's property.

b) ordered the PLAINTIFF to exit the van and stated words to the effect of, "Don't go into the van, it's being towed! Get out of the car!", of which Defendant GEHR immediately inserted his arms into the driver-side doorway area and physically prevented the PLAINTIFF from closing the door, causing Defendants CARLSON and BRIDGE rushed from their police cruiser and assisted Defendant GEHR in physically seizing the PLAINTIFF.

c) snatched the PLAINTIFF's keys from his hand without a warrant, without consent, without probable cause, and without lawful justification, having the causation of seizure unreasonable due to the fact that the PLAINTIFF was not operating the

van, was not attempting to flee, was not using the van as a weapon, and was not threatening officer safety.

d) seized and towed the PLAINTIFF's van, as well as seized the PLAINTIFF's phone and body worn camera without a warrant nor had exigent circumstances to keep said property without a warrant, and held it for over two years without a warrant, nor had any lawful justification to hold his property for that length of a time period.

e) knew or should have known that, at most, a basis to issue a ticket or investigate an alleged vehicle-related violation, that such alleged basis did not automatically justify the warrantless seizure and tow of the PLAINTIFF's van under the circumstances.

f) lacked a reasonable community-caretaking, public-safety, obstruction, abandoned-vehicle, or valid statutory basis to seize and tow the van.

g) knew or should have known that the van was not blocking traffic, was not involved in an accident, was not creating an emergency, and was not being operated on a public highway at the time of the seizure.

h) knew or reasonably should have known that the van was not abandoned because the PLAINTIFF appeared on scene, had keys, entered the van, objected to the seizure, and asserted his interest in the property, that such decision to seize and tow the van was unreasonable, excessive, retaliatory, and not supported by a lawful basis.

i) interfered with the PLAINTIFF's body-worn camera, that one or more Defendants grabbed the PLAINTIFF's body-worn camera, attempted to access it, attempted to turn it off, and damaged it.

j) knew or should have known that PLAINTIFF's body-worn camera was being used to record police activity and was part of the PLAINTIFF's protected First Amendment activity that the seizure, attempted disabling, and damaging of the PLAINTIFF's body-worn camera was unreasonable because Defendants had no warrant, no consent, no probable cause, and no lawful justification to interfere with the PLAINTIFF's recording device, of which Defendants' interference with the PLAINTIFF's body-worn camera further shows that the seizure of property was connected to Defendants' hostility toward the PLAINTIFF's protected recording and police-accountability activity.

k) Defendant MORETTI stated words to the effect of, "Yeah, I know about his channel, we all watch his channel, we know what he does," while continuing to shame the PLAINTIFF, of which MORETTI's statement further supports a reasonable inference that Defendants knew the PLAINTIFF used recording devices to document police conduct and publish police-related content.

l) proceeded to tow of the PLAINTIFF's van despite the PLAINTIFF's objection and despite knowing that the van was not abandoned.

m) Defendants GEHR, CARLSON, and BRIDGE directly participated in the unlawful seizure of the PLAINTIFF's keys, the PLAINTIFF's person, and the PLAINTIFF's van, along with other property.

n) Defendant GEHR directly participated in or caused the unlawful tow by asserting the alleged basis for the tow, participating in the seizure, and causing criminal and traffic accusations to be issued against the PLAINTIFF.

o) Defendants MORETTI and MILLER arrived on scene while the PLAINTIFF was restrained and while the van and other property were being seized, and they failed to stop or correct the unlawful property seizure despite having a realistic opportunity to intervene.

330. To the extent any Defendant did not personally seize the keys, camera, or van, that Defendant is liable for failing to intervene to stop the unlawful seizure of the PLAINTIFF's property after observing or having reason to know that the seizure was occurring.

331. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

332. As a direct and proximate result of Defendants' unlawful seizure of property and unlawful tow, the PLAINTIFF suffered deprivation of property, loss of use of his van, towing and impound expenses, forced registration and insurance expenses, damage to his body-worn camera, emotional distress, humiliation, fear of losing his property, interruption and chilling of constitutional rights, and other damages.

333. By the foregoing acts and omissions, Defendants GEHR, CARLSON, BRIDGE, MORETTI, and MILLER violated the PLAINTIFF's right to be free from unreasonable seizures of property under the Fourth Amendment to the United States Constitution.

334. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## GEHR, CARLSON, BRIDGE, MORETTI, AND MILLER
## FAILURE TO INTERVENE
## 42 U.S.C. § 1983

335. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "334", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

336. At all relevant times, Defendants GEHR, CARLSON, BRIDGE, MORETTI, and MILLER had a duty to intervene when they observed, or had reason to know, that other officers were violating the PLAINTIFF's constitutional rights.

337. On Sunday, September 24, 2023, the PLAINTIFF approached Defendants while recording with his body-worn camera and cellphone camera to understand why Buffalo Police officers were observing the PLAINTIFF's parked van near 376 DEARBORN STREET in the City of Buffalo.

338. The PLAINTIFF's van was parked, stationary, not running, not being operated, not being driven, and not abandoned.

339. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable seizures of his personal property, including his vehicle, keys, body-worn camera, and personal effects.

340. On Sunday, September 24, 2023, the PLAINTIFF's van was parked near 376 DEARBORN STREET in the City of Buffalo, while the PLAINTIFF's van was parked unabandoned, stationary, not running, not being operated, and not being

driven, the PLAINTIFF appeared on scene, possessed keys to the van, unlocked the van, entered the van, and made clear through his conduct and statements that he had an interest in the van.

341. Prior to the PLAINTIFF entering his van, Defendants informed the PLAINTIFF that he was not detained and that he was free to go, of which the PLAINTIFF proceeded to walk toward his van, unlocking it, and entering it to show that the van was not abandoned and that the PLAINTIFF had an interest in his property.

342. The ensuing conduct and actions of Defendants GEHR, MORETTI, CARLSON, MILLER, AND BRIDGE, while acting in concert, under the color of law, authorizing, directing and/or causing the failure of intervening to prevent the causation of the PLAINTIFF's constitutional rights from being violated, which caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunity, of which Defendant GEHR, MORETTI, CARLSON, MILLER, AND BRIDGE had:

a) informed the PLAINTIFF that he was not detained and that he was free to go, while soon after being told that he was not detained and was free to go, the PLAINTIFF walked to his parked van, unlocked it, and entered it to show that the van was not abandoned and that the PLAINTIFF had an interest in the property.

b) knew, or reasonably should have known, that the PLAINTIFF was not attempting to flee, was not operating the van, was not using the van as a weapon, and was not threatening officer safety.

c) Defendant GEHR insert his arms into the driver-side doorway area and physically prevented the PLAINTIFF from closing the door, subsequently

causing Defendants CARLSON and BRIDGE to rush from their police cruiser and assist Defendant GEHR in going hands-on with the PLAINTIFF.

d) Defendants GEHR, CARLSON, and BRIDGE physically grabbed, restrained, pulled, shoved, and removed the PLAINTIFF from the van after seizing the PLAINTIFF's keys from his hand.

e) opened the passenger-side front door and threatened the PLAINTIFF with a taser, of which Defendants knew or should have known that the PLAINTIFF was not a threat and that use of a taser was not reasonable.

f) Defendants forced the PLAINTIFF to the street pavement in the prone position and placing the PLAINTIFF in handcuffs without first informing the PLAINTIFF that he was under arrest, when asked Defendants stated that the PLAINTIFF he was under arrest for "resisting arrest," or words to that effect.

g) a realistic opportunity to intervene before and during the physical seizure, removal from the van, taser threat, prone restraint, handcuffing, arrest, and placement of the PLAINTIFF into Defendant GEHR's cruiser.

h) failed to intervene to stop or prevent the unlawful seizure, excessive force, false arrest, and retaliation against the PLAINTIFF.

i) placed inside Defendant GEHR's cruiser while restrained, knowing that the PLAINTIFF was obese ignoring the fact that Defendants single cuffing the PLAINTIFF in a manner will cause more pressure to the PLAINTIFF's neck and back.

j) been aware that the PLAINTIFF complained to Defendants about the cuffs and the pressure caused by the restraints, but rather than immediately correct the

restraint, Defendants gaslight the PLAINTIFF by responding words to the effect of, "You shouldn't have fought with us.", after of which Defendant MILLER responded words to the effect of, "Are you going to cooperate?"

k) a realistic opportunity to intervene in Defendant MILLER, to promptly correct the painful and unreasonable restraint but failed to do so without first demanding cooperation from the PLAINTIFF.

l) a realistic opportunity to intervene, in Defendant MORETTI, to stop or correct the unlawful conduct, including the continued detention, painful restraint, property seizure, tow, camera interference, taunting, and shaming of the PLAINTIFF.

m) laughed, joked, poked fun, taunted, and belittled the PLAINTIFF while he was restrained in the cruiser.

n) grabbed the PLAINTIFF's body-worn camera, attempted to access it, attempted to turn it off, and damaged it.

o) knew, or reasonably should have known, that the PLAINTIFF's body-worn camera was being used to record police activity and that interference with the camera violated the PLAINTIFF's First and Fourth Amendment rights.

p) a realistic opportunity to intervene to prevent or stop the seizure, attempted disabling, and damaging of the PLAINTIFF's body-worn camera but failed to intervene to prevent or stop the seizure, attempted disabling, and damaging of the PLAINTIFF's body-worn camera.

q) proceeded with the seizure and tow of the PLAINTIFF's van despite the PLAINTIFF's objection and despite knowing, or reasonably having reason to

know, that the van was parked, stationary, not running, not being operated, not being driven, and not abandoned.

r) a realistic opportunity to intervene to prevent or stop the unlawful seizure and tow of the PLAINTIFF's van but shown that such seizure was willful when refusing to give van keys to the PLAINTIFF's wife at the time of the towing.

s) failed to intervene to prevent or stop the unlawful seizure and tow of the PLAINTIFF's van.

t) Defendant MORETTI stated words to the effect of, "Yeah, I know about his channel, we all watch his channel, we know what he does," while continuing to shame the PLAINTIFF, of which Defendant MORETTI's statement showed knowledge of the PLAINTIFF's protected First Amendment activity and supports that the continued failure to intervene was connected to retaliatory hostility toward the PLAINTIFF's recording, criticism, and police-accountability activity.

u) knew, or reasonably should have known, that the PLAINTIFF's First Amendment rights were being violated because the PLAINTIFF was being punished, burdened, or deterred for recording police, questioning officers, and publishing criticism of police conduct.

v) knew, or reasonably should have known, that the PLAINTIFF's Fourth Amendment rights were being violated because the PLAINTIFF was seized, arrested, subjected to force, restrained, and deprived of property without probable cause or lawful justification.

343. To the extent any Defendant did not personally apply force, personally threaten taser use, personally seize the keys, personally damage the camera, personally tow

the van, or personally initiate criminal charges, that Defendant is liable because he observed or had reason to know that constitutional violations were occurring, had a realistic opportunity to intervene, and failed to do so.

344. Defendants' failure to intervene allowed the unconstitutional conduct to continue and directly contributed to the PLAINTIFF's injuries.

345. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the First and Fourth Amendments.

346. As a direct and proximate result of Defendants' failure to intervene, the PLAINTIFF suffered loss of liberty, physical pain, painful restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, deprivation of property, towing and impound expenses, damage to his body-worn camera, criminal prosecution, traffic tickets, and other damages.

347. By the foregoing acts and omissions, Defendants GEHR, CARLSON, BRIDGE, MORETTI, and MILLER violated the PLAINTIFF's constitutional rights by failing to intervene to prevent or stop the violation of the PLAINTIFF's First and Fourth Amendment rights.

348. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANT

## GEHR

## MALICIOUS PROSECUTION

## 42 U.S.C. § 1983

349. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "348", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

350. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from malicious prosecution, unreasonable seizure, and criminal prosecution initiated without probable cause.

351. On Sunday, September 24, 2023, the PLAINTIFF approached Buffalo Police officers near 376 DEARBORN STREET in the City of Buffalo to understand why officers were observing the PLAINTIFF's van., parked, stationary, not running, not being operated, not being driven, and not abandoned.

352. That the conduct and actions of Defendant GEHR, while acting in concert, under the color of law, authorizing, directing and/or causing malicious prosecution that caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in his official capacity prior to him waving his qualified immunity, of which Defendant GEHR had:

a) escalated the encounter by inserting his arms into the driver-side doorway area and physically preventing the PLAINTIFF from closing the door, causing other Defendants to then go hands-on with the PLAINTIFF, seizing the PLAINTIFF, as they pulled and ripped the PLAINTIFF from the van, forcing the PLAINTIFF to the street pavement, placing the PLAINTIFF in handcuffs, and placed in Defendant GEHR's police cruiser.

b) not informed the PLAINTIFF that he was under arrest until after Defendants had already gone hands-on and placed or were placing the PLAINTIFF in handcuffs.

c) initiated criminal proceedings against the PLAINTIFF by submitting accusatory instruments against the PLAINTIFF, charging the PLAINTIFF with RESISTING ARREST under New York Penal Law § 205.30, OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE under New York Penal Law § 195.05, HARASSMENT IN THE SECOND DEGREE under New York Penal Law § 240.26, two counts of DISORDERLY CONDUCT under New York Penal Law § 240.20, and the causation of multiple New York State Department of Motor Vehicles Uniform Traffic Tickets to be issued against the PLAINTIFF in retaliation against the PLAINTIFF'S rights.

d) lacked probable cause to initiate or continue criminal proceedings against the PLAINTIFF.

e) lacked probable cause to charge the PLAINTIFF with RESISTING ARREST because the PLAINTIFF was not resisting a lawful arrest, and any alleged physical contact or noncompliance occurred only after Defendants escalated the encounter and physically seized the PLAINTIFF without probable cause.

f) lacked probable cause to charge the PLAINTIFF with OBSTRUCTING GOVERNMENTAL ADMINISTRATION because the PLAINTIFF did not

intentionally obstruct, impair, or prevent any lawful governmental function by intimidation, physical force, interference, or any independently unlawful act.

g) lacked probable cause to charge the PLAINTIFF with HARASSMENT IN THE SECOND DEGREE because the PLAINTIFF did not intentionally strike, shove, kick, or otherwise subject Defendant GEHR to unlawful physical contact, and did not act with intent to harass, annoy, or alarm Defendant GEHR.

h) lacked probable cause to charge the PLAINTIFF with the two counts DISORDERLY CONDUCT because the PLAINTIFF did not intentionally cause public inconvenience, annoyance, or alarm, did not recklessly create such a risk, did not engage in violent or tumultuous conduct, and did not create any public disorder.

i) lacked probable cause of the causation of traffic tickets to be issued against the PLAINTIFF based on alleged operation of the van because the van was parked, stationary, not running, not being operated, and not being driven by the PLAINTIFF at the time of the incident.

j) GEHR knew, or reasonably should have known, that the PLAINTIFF had not committed the crimes charged.

k) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF had been told he was not detained and was free to go before the PLAINTIFF entered his own parked van and that the van was not abandoned.

l) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF was not operating the van and was not attempting to drive away.

Case 1:26-cv-01112-LJV   Document 1   Filed 06/01/26   Page 99 of 149

m) acted with malice, retaliatory motive, or reckless disregard for the PLAINTIFF's rights by initiating criminal charges after Defendants unlawfully escalated the encounter, seized the PLAINTIFF, used force against the PLAINTIFF, interfered with the PLAINTIFF's recording activity, and towed the PLAINTIFF's van.

n) Malice may be inferred from the absence of probable cause, the Defendants' escalation of the encounter after telling the PLAINTIFF that he was free to go, the PLAINTIFF's protected recording and police-accountability activity, the attempted interference with the PLAINTIFF's body-worn camera, and Defendant GEHR's submission of accusatory instruments that mischaracterized the PLAINTIFF's conduct.

o) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF had previously criticized Defendant GEHR and Defendant MORETTI through protected speech on the PLAINTIFF's YouTube channel, of which Defendant GEHR's initiation of criminal proceedings against the PLAINTIFF was influenced by retaliatory animus of the video criticizing them, which lack of probable cause and a reckless disregard for the PLAINTIFF's constitutional rights.

353. As a result of Defendant GEHR's accusatory instruments and criminal charges, the PLAINTIFF was subjected to criminal proceedings, of which the PLAINTIFF suffered a prosecution-related deprivation of liberty, including but not limited to being booked, required to defend against criminal accusations, required to appear in court, subjected to the burdens and restrictions of pending criminal charges, and exposed to the threat of conviction and punishment.

354. The criminal charges and tickets terminated in the PLAINTIFF's favor when they were dropped and dismissed in February of 2026.

355. The favorable termination of the charges and tickets ended without a conviction against the PLAINTIFF.

356. Defendant GEHR acted under color of state law and intentionally, knowingly, maliciously, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the Fourth Amendment.

357. As a direct and proximate result of Defendant GEHR's malicious prosecution, the PLAINTIFF suffered loss of liberty, humiliation, emotional distress, reputational harm, fear, anxiety, interruption and chilling of constitutional rights, court appearances, the burden of defending against criminal accusations, towing and impound expenses, traffic-ticket burdens, and other damages.

358. By the foregoing acts and omissions, Defendant GEHR violated the PLAINTIFF's right to be free from malicious prosecution under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

359. The PLAINTIFF is entitled to compensatory damages, punitive damages against Defendant GEHR, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
## AGAINST
## DEFENDANT GEHR
## MALICIOUS PROSECUTION
## UNDER NEW YORK STATE LAW CLAIM

360. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "359", all inclusive of this

Complaint, with the same force and effect as though the same were more fully set forth herein.

361. At all relevant times, the PLAINTIFF had the right under New York Law to be free from malicious prosecution, unreasonable seizure, and criminal prosecution initiated without probable cause.

362. On Sunday, September 24, 2023, the PLAINTIFF approached Buffalo Police officers near 376 DEARBORN STREET in the City of Buffalo to understand why officers were observing the PLAINTIFF's van., parked, stationary, not running, not being operated, not being driven, and not abandoned.

363. That the conduct and actions of Defendant GEHR, while acting in concert, under the color of law, authorizing, directing and/or causing malicious prosecution that caused irreparable harm to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in his official capacity prior to him waving his qualified immunity, of which Defendant GEHR had:

a) escalated the encounter by inserting his arms into the driver-side doorway area and physically preventing the PLAINTIFF from closing the door, causing other Defendants to then go hands-on with the PLAINTIFF, seizing the PLAINTIFF, as they pulled and ripped the PLAINTIFF from the van, forcing the PLAINTIFF to the street pavement, placing the PLAINTIFF in handcuffs, and placed in Defendant GEHR's police cruiser.

b) not informed the PLAINTIFF that he was under arrest until after Defendants had already gone hands-on and placed or were placing the PLAINTIFF in handcuffs.

c) initiated criminal proceedings against the PLAINTIFF by submitting accusatory instruments against the PLAINTIFF, charging the PLAINTIFF with RESISTING ARREST under New York Penal Law § 205.30, OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE SECOND DEGREE under New York Penal Law § 195.05, HARASSMENT IN THE SECOND DEGREE under New York Penal Law § 240.26, two counts of DISORDERLY CONDUCT under New York Penal Law § 240.20, and the causation of multiple New York State Department of Motor Vehicles Uniform Traffic Tickets to be issued against the PLAINTIFF in retaliation against the PLAINTIFF'S.

d) lacked probable cause to initiate or continue criminal proceedings against the PLAINTIFF.

e) lacked probable cause to charge the PLAINTIFF with RESISTING ARREST because the PLAINTIFF was not resisting a lawful arrest, and any alleged physical contact or noncompliance occurred only after Defendants escalated the encounter and physically seized the PLAINTIFF without probable cause.

f) lacked probable cause to charge the PLAINTIFF with OBSTRUCTING GOVERNMENTAL ADMINISTRATION because the PLAINTIFF did not intentionally obstruct, impair, or prevent any lawful governmental function by intimidation, physical force, interference, or any independently unlawful act.

g) lacked probable cause to charge the PLAINTIFF with HARASSMENT IN THE SECOND DEGREE because the PLAINTIFF did not intentionally strike, shove, kick, or otherwise subject Defendant GEHR to unlawful physical contact, and did not act with intent to harass, annoy, or alarm Defendant GEHR.

h) lacked probable cause to charge the PLAINTIFF with the two counts DISORDERLY CONDUCT because the PLAINTIFF did not intentionally cause

public inconvenience, annoyance, or alarm, did not recklessly create such a risk, did not engage in violent or tumultuous conduct, and did not create any public disorder.

i) lacked probable cause of the causation of traffic tickets to be issued against the PLAINTIFF based on alleged operation of the van because the van was parked, stationary, not running, not being operated, and not being driven by the PLAINTIFF at the time of the incident.

j) GEHR knew, or reasonably should have known, that the PLAINTIFF had not committed the crimes charged.

k) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF had been told he was not detained and was free to go before the PLAINTIFF entered his own parked van and that the van was not abandoned.

l) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF was not operating the van and was not attempting to drive away.

m) acted with malice, retaliatory motive, or reckless disregard for the PLAINTIFF's rights by initiating criminal charges after Defendants unlawfully escalated the encounter, seized the PLAINTIFF, used force against the PLAINTIFF, interfered with the PLAINTIFF's recording activity, and towed the PLAINTIFF's van.

n) Malice may be inferred from the absence of probable cause, the Defendants' escalation of the encounter after telling the PLAINTIFF that he was free to go, the PLAINTIFF's protected recording and police-accountability activity, the attempted interference with the PLAINTIFF's body-worn camera, and Defendant GEHR's submission of accusatory instruments that mischaracterized the PLAINTIFF's conduct.

o) Defendant GEHR knew, or reasonably should have known, that the PLAINTIFF had previously criticized Defendant GEHR and Defendant MORETTI through protected speech on the PLAINTIFF's YouTube channel, of which Defendant GEHR's initiation of criminal proceedings against the PLAINTIFF was influenced by retaliatory animus of the video criticizing them, which lack of probable cause and a reckless disregard for the PLAINTIFF's state constitutional rights.

364. As a result of Defendant GEHR's accusatory instruments and criminal charges, the PLAINTIFF was subjected to criminal proceedings, of which the PLAINTIFF suffered a prosecution-related deprivation of liberty, including but not limited to being booked, required to defend against criminal accusations, required to appear in court, subjected to the burdens and restrictions of pending criminal charges, and exposed to the threat of conviction and punishment.

365. The criminal charges and tickets terminated in the PLAINTIFF's favor when they were dropped and dismissed in February of 2026.

366. The favorable termination of the charges and tickets ended without a conviction against the PLAINTIFF.

367. Defendant GEHR acted under color of state law and intentionally, knowingly, maliciously, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the Fourth Amendment under New York State Law.

368. As a direct and proximate result of Defendant GEHR's malicious prosecution, the PLAINTIFF suffered loss of liberty, humiliation, emotional distress, reputational harm, fear, anxiety, interruption and chilling of constitutional rights, court appearances, the

burden of defending against criminal accusations, towing and impound expenses, traffic-ticket burdens, and other damages.

369. By the foregoing acts and omissions, Defendant GEHR violated the PLAINTIFF's right to be free from malicious prosecution under New York Law.

370. The PLAINTIFF is entitled to compensatory damages, punitive damages against Defendant GEHR, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
## AGAINST
## DEFENDANTS BOH AND VITELLO
## FIRST AMENDMENT RETALIATORY ARREST/ SEIZURE
## 42 U.S.C. § 1983

371. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "370", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

372. At all relevant times, the PLAINTIFF had the right under the First Amendment to ask police officers questions, request identifying information, request public-record information, criticize police conduct, challenge unlawful police orders, and verbally object to police conduct without being seized, handcuffed, or threatened with arrest.

373. On Saturday, April 4, 2026, Defendants BOH and VITELLO entered the driveway area within the curtilage of the PLAINTIFF's home while responding to a call for service involving another person and an upstairs unit.

374. The PLAINTIFF initially observed Defendants BOH and VITELLO from inside his kitchen while cooking a meal, when Defendant VITELLO looked into the PLAINTIFF's kitchen window and asked the PLAINTIFF whether he had called police.

375. As the PLAINTIFF could not hear Defendant VITELLO clearly, so the PLAINTIFF exited his home through the back door and met Defendants outside in the driveway.

376. Defendant VITELLO asked the PLAINTIFF whether he was involved with the call for service, the PLAINTIFF answered no and informed Defendant VITELLO that the house was a four-unit complex where multiple people lived and where someone else may have called as the PLAINTIFF further explained the layout of the units to Defendant VITELLO.

377. After observing the situation involving the woman, the tenant's father, and the upstairs unit, the PLAINTIFF informed Defendants BOH and VITELLO that the matter appeared to be a civil dispute.

378. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing the First Amendment retaliatory arrest/ retaliatory seizure to the PLAINTIFF, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) after The PLAINTIFF asked who generated the call for service, Defendant BOH became aggressive with the PLAINTIFF and ordered the PLAINTIFF to go back inside the house, stating words to the effect that the matter did not concern the PLAINTIFF.

b) after Defendant BOH being told to tone it down and that the PLAINTIFF was speaking cordially and by requesting the CAD number of the call for service, did Defendant BOH became angrier and refused to provide the information.

c) shouted at the PLAINTIFF and gave unlawful orders for the PLAINTIFF to go back into the house, claiming that the PLAINTIFF was interfering with Defendants' investigation.

d) after The PLAINTIFF verbally challenged Defendant BOH's authority and stated that Defendant BOH had no authority to order a person back into his own home, stating that interference with an investigation required a physical act and not verbal questioning alone, and after requesting public-record information, request for the CAD number regarding call for service, and criticism of Defendant BOH's conduct, did BOH took adverse action against the PLAINTIFF after the PLAINTIFF engaged in protected First Amendment activity.

e) Defendant BOH grabbed the PLAINTIFF without lawful justification as Defendant VITELLO joined Defendant BOH in the seizure, shoving the PLAINTIFF into the side of his home and applying handcuffs to the PLAINTIFF.

f) Defendant BOH informed the PLAINTIFF that the PLAINTIFF was under arrest for interfering with Defendant BOH's investigation due to asking questions.

g) then walked the PLAINTIFF approximately thirty feet toward the police cruisers, of which after the PLAINTIFF informing Defendant BOH that he lacked probable cause and that interference required a physical act did BOH eventually let the PLAINTIFF go but no until BOH propositioned the PLAINTIFF by stating words to the effect of, "If I place you out of these handcuffs, you're not going to be

asking us any more questions? You're going to go into your house, otherwise I'm going to place you under arrest."

h) Defendant BOH's statement showed that the PLAINTIFF's questions, criticism, and refusal to stop speaking were substantial or motivating factors in Defendant BOH's seizure, handcuffing, and threat of arrest.

i) refused to answer the PLAINTIFF's questions and released the PLAINTIFF.

j) Chilled actions a person of ordinary firmness from continuing to ask questions, request public records, request officer identification, criticize police conduct, challenge unlawful orders, or observe police activity.

k) lacked probable cause, reasonable suspicion, or any lawful basis to seize, handcuff, threaten, or retaliate against the PLAINTIFF for asking questions and verbally objecting to police conduct.

l) knew or should have known the PLAINTIFF did not physically interfere with Defendants, did not threaten Defendants, did not obstruct Defendants by force or physical act, and did not prevent Defendants from performing any lawful function.

m) knew or should have known the PLAINTIFF's verbal questioning, criticism, and request for information did not authorize Defendants to seize, handcuff, or threaten the PLAINTIFF with arrest.

379. Defendants BOH and VITELLO acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his First Amendment rights.

380. As a direct and proximate result of Defendants' retaliatory seizure, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, and other damages.

381. By the foregoing acts and omissions, Defendants BOH and VITELLO violated the PLAINTIFF's right to be free from retaliation for protected First Amendment activity.

382. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
## AGAINST
## DEFENDANT BOH
## FIRST AMENDMENT PRIOR RESTRAINT / RETALIATORY THREAT
## 42 U.S.C. § 1983

383. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "382", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

384. At all relevant times, the PLAINTIFF had the right under the First Amendment to ask police officers questions, request officer identification, request public-record information, request a CAD number, verbally object to police conduct, criticize police conduct, and remain outside his own home without being threatened with arrest for protected speech.

385. On Saturday, April 4, 2026, the PLAINTIFF asked Defendants BOH and VITELLO questions regarding the call for service, who generated the call, and the CAD number.

386. The PLAINTIFF informed Defendant BOH that the CAD number and call information were public records and that the PLAINTIFF could obtain such information through FOIL.

387. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing prior restraint of the PLAINTIFF's the First Amendment right, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) became angry and aggressive after the PLAINTIFF asked questions, requested the CAD number, and challenged Defendant BOH's authority.

b) ordered the PLAINTIFF to go back inside the house and accused the PLAINTIFF of interfering with Defendants' investigation.

c) after the PLAINTIFF verbally objected and informed Defendant BOH that Defendant BOH had no lawful authority to order the PLAINTIFF back inside his own home for asking questions, did BOH grabbed the PLAINTIFF without lawful justification, while having Defendant VITELLO joined Defendant BOH by shoving the PLAINTIFF into the side of his home and placed the PLAINTIFF in handcuffs.

d) informed the PLAINTIFF that he was under arrest for interfering with the investigation.

e) walked the PLAINTIFF approximately thirty feet toward the police cruisers as the PLAINTIFF informed Defendant BOH that Defendant BOH lacked probable cause and that verbal questioning did not constitute interference.

f) Defendant BOH then propositioned the PLAINTIFF by stating words to the effect of, "If I place you out of these handcuffs, you're not going to be asking us any more questions? You're going to go into your house, otherwise I'm going to place you under arrest.", which his imposed an unconstitutional condition on the PLAINTIFF's release from handcuffs.

g) Defendant BOH conditioned the PLAINTIFF's release on the PLAINTIFF surrendering his First Amendment rights to ask questions, request information, criticize police conduct, and remain outside his own home.

h) knew or should have known that Defendant BOH's threat was a prior restraint because it attempted to prevent the PLAINTIFF from engaging in future protected speech by threatening arrest if the PLAINTIFF continued asking questions.

i) knew or should have known Defendant BOH's threat was also retaliatory because it punished and chilled the PLAINTIFF's protected speech after the PLAINTIFF questioned Defendant BOH, requested public-record information, challenged Defendant BOH's authority, and verbally objected to Defendant BOH's conduct.

j) no probable cause, reasonable suspicion, or lawful basis to threaten the PLAINTIFF with arrest for asking questions, requesting public-record information, requesting officer identification, criticizing police conduct, or verbally objecting to police conduct.

388. The PLAINTIFF did not physically interfere with Defendant BOH, did not threaten Defendant BOH, did not obstruct Defendant BOH by force or physical act, and did not prevent Defendant BOH from performing any lawful function.

389. Defendant BOH's threat would chill a person of ordinary firmness from continuing to ask questions, request officer identification, request public-record information, criticize police conduct, challenge unlawful police orders, or observe police activity.

390. Defendant BOH's conduct was intentional, retaliatory, objectively unreasonable, and undertaken under color of state law.

391. As a direct and proximate result of Defendant BOH's prior restraint and retaliatory threat, the PLAINTIFF suffered loss of liberty, chilling of constitutional rights, humiliation, emotional distress, fear, and other damages.

392. By the foregoing acts and omissions, Defendant BOH violated the PLAINTIFF's rights under the First Amendment to the United States Constitution.

393. The PLAINTIFF is entitled to compensatory damages, punitive damages against Defendant BOH, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
## AGAINST
## DEFENDANTS BOH AND VITELLO
## FOURTH AMENDMENT FALSE ARREST / UNLAWFUL SEIZURE
## 42 U.S.C. § 1983

394. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "393", all inclusive of this

Complaint, with the same force and effect as though the same were more fully set forth herein.

395. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable seizure, false arrest, and arrest without probable cause

396. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing the false arrest and unlawful seizure which violated the PLAINTIFF's the Fourth Amendment right, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) became aggressive with the PLAINTIFF and ordered the PLAINTIFF to go back inside the house, stating words to the effect that the matter did not concern the PLAINTIFF.

b) then shouted at the PLAINTIFF and ordered the PLAINTIFF to go back into the house, claiming that the PLAINTIFF was interfering with Defendants' investigation.

c) grabbed the PLAINTIFF without lawful justification, while Defendant VITELLO joined Defendant BOH in the seizure.

d) shoved the PLAINTIFF into the side of his home and applied handcuffs to the PLAINTIFF.

e) Defendant BOH then walked the PLAINTIFF approximately thirty feet toward the police cruisers.

f) Defendant BOH propositioned the PLAINTIFF by stating words to the effect of, "If I place you out of these handcuffs, you're not going to be asking us any more questions? You're going to go into your house, otherwise I'm going to place you under arrest."

g) A reasonable person in the PLAINTIFF's position would not have felt free to leave while being grabbed, shoved, handcuffed, told he was under arrest, and walked toward the police cruisers.

h) lacked probable cause and reasonable suspicion to arrest or seize the PLAINTIFF for interfering with an investigation.

i) Defendants lacked any lawful basis to order the PLAINTIFF back into his own home merely because he asked questions, requested the CAD number, mentioned FOIL, requested public-record information, or verbally challenged Defendant BOH's authority.

397. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

398. As a direct and proximate result of Defendants' false arrest and unlawful seizure, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, and other damages.

399. By the foregoing acts and omissions, Defendants BOH and VITELLO violated the PLAINTIFF's right to be free from false arrest and unreasonable seizure under the Fourth Amendment to the United States Constitution.

400. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## TWENTY-SECOND CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## BOH AND VITELLO
## FOURTH AMENDMENT EXCESSIVE FORCE
## 42 U.S.C. § 1983

401. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "400", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

402. At all relevant times, the PLAINTIFF had the right under the Fourth Amendment to be free from unreasonable, unnecessary, and excessive force during a seizure or arrest.

403. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing excessive force which violated the PLAINTIFF's the Fourth Amendment right, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) Defendant BOH, lacking any lawful justification, grabbed the PLAINTIFF, While Defendant VITELLO joined Defendant BOH in the physical seizure of the PLAINTIFF.

b) shoved the PLAINTIFF into the side of his home, while VITELLO applying handcuffs to the PLAINTIFF.

c) known or should have known that the force used against the PLAINTIFF was unreasonable because the PLAINTIFF was not committing a violent offense, was not armed, was not threatening officer safety, was not threatening public safety, was not attempting to flee, and was not physically resisting a lawful arrest.

d) known or should have known that the force used against the PLAINTIFF was unreasonable because any alleged "interference" consisted only of verbal questioning and criticism.

e) less intrusive alternatives available, including answering the PLAINTIFF's questions, providing the CAD number, explaining the call for service, directing their attention to the actual call, walking away from the PLAINTIFF, or giving a lawful warning instead of grabbing, shoving, handcuffing, and threatening arrest.

f) known or should have known that the use of force was not reasonably necessary to accomplish any legitimate law-enforcement objective.

g) Defendants knew, or reasonably should have known, that using physical force against the PLAINTIFF under these circumstances was excessive and objectively unreasonable.

h) Defendant BOH directly participated in the excessive force by grabbing the PLAINTIFF, causing the PLAINTIFF to be shoved into the side of the home,

placing or assisting in placing the PLAINTIFF in handcuffs, and walking the PLAINTIFF toward the police cruisers.

i) Defendant VITELLO directly participated in the excessive force by joining Defendant BOH in grabbing, shoving, restraining, and handcuffing the PLAINTIFF.

404. As a direct and proximate result of Defendants' excessive force, the PLAINTIFF suffered physical restraint, pain or discomfort, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, and other damages.

405. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his Fourth Amendment rights.

406. By the foregoing acts and omissions, Defendants BOH and VITELLO violated the PLAINTIFF's right to be free from excessive force under the Fourth Amendment to the United States Constitution.

407. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION

### AGAINST

### DEFENDANTS

### BOH AND VITELLO

### FAILURE TO INTERVENE

### 42 U.S.C. § 1983

408. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "407", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

409. At all relevant times, Defendants BOH and VITELLO had a duty to intervene when they observed, or had reason to know, that another officer was violating the PLAINTIFF's constitutional rights.

410. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing failure to intervening the PLAINTIFF's constitutional rights from being violated, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) a realistic opportunity, in BOH, to stop or prevent Defendant VITELLO from participating in the unlawful seizure, handcuffing, and use of force against the PLAINTIFF.

b) a realistic opportunity, in VITELLO, to stop or prevent Defendant BOH from grabbing the PLAINTIFF, handcuffing the PLAINTIFF, threatening the

PLAINTIFF with arrest, and conditioning release on the PLAINTIFF's silence and return inside his home.

c) knew, or reasonably should have known, that the PLAINTIFF was engaged in protected First Amendment activity by asking questions, requesting public-record information, criticizing police conduct, and verbally objecting to Defendant BOH's authority.

d) knew, or reasonably should have known, that the PLAINTIFF's First Amendment rights were being violated because the PLAINTIFF was being seized, handcuffed, threatened, and silenced for verbal questioning and criticism.

e) knew, or reasonably should have known, that the PLAINTIFF's Fourth Amendment rights were being violated because the PLAINTIFF was grabbed, shoved, handcuffed, told he was under arrest, and walked toward police cruisers without probable cause, reasonable suspicion, or lawful justification.

f) knew, or reasonably should have known, that the force used against the PLAINTIFF was excessive because the PLAINTIFF was not violent, was not armed, was not threatening anyone, was not fleeing, and was not physically interfering with any lawful police function.

g) had a realistic opportunity to intervene before and during the seizure, handcuffing, use of force, threat of arrest, and conditioning of release.

h) failed to take reasonable steps to prevent or stop the violation of the PLAINTIFF's constitutional rights.

i) To the extent either Defendant did not personally perform every act alleged, that Defendant is liable because he observed or had reason to know that constitutional

violations were occurring, had a realistic opportunity to intervene, and failed to do so.

411. Defendants' failure to intervene allowed the unconstitutional conduct to continue and directly contributed to the PLAINTIFF's injuries.

412. Defendants acted under color of state law and intentionally, knowingly, recklessly, or with deliberate indifference deprived the PLAINTIFF of his rights under the First and Fourth Amendments.

413. As a direct and proximate result of Defendants' failure to intervene, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, and other damages.

414. By the foregoing acts and omissions, Defendants BOH and VITELLO violated the PLAINTIFF's constitutional rights by failing to intervene to prevent or stop the violation of the PLAINTIFF's First and Fourth Amendment rights.

415. The PLAINTIFF is entitled to compensatory damages, punitive damages against the individual defendants, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## BOH AND VITELLO

## FALSE ARREST / FALSE IMPRISONMENT

## UNDER NEW YORK STATE LAW CLAIM

416. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "415", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

417. At all relevant times, the PLAINTIFF had the right under New York law to be free from false arrest, false imprisonment, and unlawful confinement.

418. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing the false arrest, false imprisonment, and unlawful confinement the PLAINTIFF's state constitutional rights from being violated, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) Defendant BOH, lacking lawful justification, grabbed the PLAINTIFF while Defendant VITELLO joined Defendant BOH in the seizure.

b) shoved the PLAINTIFF into the side of his home and applied handcuffs to the PLAINTIFF.

c) informed the PLAINTIFF that the PLAINTIFF was under arrest for interfering with Defendant BOH's investigation.

d) walked the PLAINTIFF approximately thirty feet toward the police cruisers.

e) intended to confine the PLAINTIFF by grabbing him, handcuffing him, telling him he was under arrest, and walking him toward the police cruisers.

419. The PLAINTIFF was conscious of the confinement because he asked why he was being arrested, challenged the lack of probable cause, and questioned Defendant BOH's authority to arrest him for verbal questioning.

420. The PLAINTIFF did not have freedom of movement while Defendants held him, handcuffed him, and walked him toward the police cruisers.

421. Defendants' confinement of the PLAINTIFF was not privileged because Defendants lacked probable cause, reasonable suspicion, or lawful justification to detain, handcuff, arrest, or confine the PLAINTIFF.

422. As a direct and proximate result of Defendants' false arrest and false imprisonment, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, and other damages.

423. By the foregoing acts and omissions, Defendants BOH and VITELLO committed false arrest and false imprisonment under New York law.

424. The PLAINTIFF is entitled to compensatory damages, punitive damages where permitted, costs, and all other relief this Court deems just and proper.

**TWENTY-FIFTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS BOH AND VITELLO**

**UNDER NEW YORK STATE LAW CLAIMT**

**ASSAULT AND BATTERY**

425. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "424", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

426. At all relevant times, the PLAINTIFF had the right under New York law to be free from unlawful assault, battery, offensive physical contact, and threats of unlawful physical force.

427. That the conduct and actions of Defendants, BOH and VITELLO while acting in concert, under the color of law, authorizing, directing and/or causing assault and battery to the PLAINTIFF's, violating his state constitutional rights, without justification by the improper, impermissible and unprofessional use of authority in their official capacity prior to them waving their qualified immunities, of which Defendants, BOH and VITELLO had:

a) Defendant BOH, lacking lawful justification, grabbed the PLAINTIFF while Defendant VITELLO joined Defendant BOH in the physical seizure of the PLAINTIFF, while shoving the PLAINTIFF into the side of his home to apply handcuffs to the PLAINTIFF.

b) knew or should have known that Defendants' grabbing, shoving, handcuffing, restraining, and moving of the PLAINTIFF constituted intentional physical contact.

c) knew or should have known that the physical contact was offensive, harmful, unwanted, and without the PLAINTIFF's consent.

d) knew or should have known that the Defendants' conduct constituted battery under New York law because Defendants intentionally made unlawful physical contact with the PLAINTIFF without legal justification.

e) knew or should have known Defendants' conduct also placed the PLAINTIFF in fear and apprehension of further unlawful physical contact, restraint, arrest, and confinement.

f) Defendants' conduct constituted assault under New York law because Defendants intentionally placed the PLAINTIFF in imminent apprehension of unlawful physical contact and continued restraint.

g) knew or should have known that the Defendants' physical force and threats were not privileged because Defendants lacked probable cause, reasonable suspicion, or lawful justification to seize, arrest, handcuff, threaten, or use force against the PLAINTIFF.

428. As a direct and proximate result of Defendants' assault and battery, the PLAINTIFF suffered physical restraint, pain or discomfort, humiliation, emotional distress, fear, loss of liberty, interruption and chilling of constitutional rights, and other damages.

429. By the foregoing acts and omissions, Defendants BOH and VITELLO committed assault and battery under New York law.

430. The PLAINTIFF is entitled to compensatory damages, punitive damages where permitted, costs, and all other relief this Court deems just and proper.

## TWENTY-SIXTH CAUSE OF ACTION
## AGAINST
## DEFENDANT
## BUFFALO
## MONELL MUNICIPAL LIABILITY
## 42 U.S.C. § 1983

431. The PLAINTIFF repeats, reiterates and realleges each allegation contained and set forth in paragraphs marked and numbered "1" through "430", all inclusive of this Complaint, with the same force and effect as though the same were more fully set forth herein.

432. At all relevant times, Defendant BUFFALO was a municipal entity responsible for the policies, customs, practices, training, supervision, discipline, and conduct of the Buffalo Police Department and its officers.

433. Defendant BUFFALO, through its police department, officers, supervisors, policymakers, practices, customs, training failures, supervision failures, and ratification of unconstitutional conduct, caused the deprivation of the PLAINTIFF's rights under the First and Fourth Amendments to the United States Constitution.

434. Defendant BUFFALO is liable under 42 U.S.C. § 1983 because the constitutional violations alleged herein were caused by municipal policies, customs, practices, failures to train, failures to supervise, failures to discipline, ratification, and/or deliberate indifference to the constitutional rights of the PLAINTIFF.

435. The violations alleged herein were not isolated accidents, but were the foreseeable result of Defendant BUFFALO's policies, customs, practices, and deliberate indifference.

436. Defendant BUFFALO maintained, tolerated, and/or failed to correct a policy, custom, or practice of Buffalo Police officers interfering with protected First Amendment activity, including recording police officers, criticizing police officers, asking questions, requesting public information, engaging in religious street preaching, and verbally objecting to police conduct.

437. Defendant BUFFALO failed to properly train and supervise its officers regarding the right of persons to record police officers, ask questions, request officer information, request CAD or public-record information, criticize police conduct, and verbally object to police conduct without being seized, threatened, arrested, or retaliated against.

438. Defendant BUFFALO failed to properly train and supervise its officers regarding the First Amendment rights of street preachers, religious speakers, public speakers, and persons engaged in protected speech in traditional public forums.

439. Defendant BUFFALO failed to properly train and supervise its officers regarding unlawful heckler's veto situations, including situations where officers suppress the speaker because hostile listeners dislike, oppose, confront, or react negatively to the speaker's message.

440. Defendant BUFFALO failed to properly train and supervise its officers that police may not silence, remove, seize, or arrest a speaker merely because the speaker's message causes disagreement, anger, controversy, or crowd reaction.

441. Defendant BUFFALO failed to properly train and supervise its officers regarding viewpoint discrimination, religious speech, free exercise, and the use of alleged permit or amplification requirements as a pretext to suppress protected speech.

442. Defendant BUFFALO failed to properly train and supervise its officers regarding the Fourth Amendment limits on seizures, arrests, handcuffing, use of force, threats of taser force, searches of personal property, and seizures of vehicles and recording devices.

443. Defendant BUFFALO failed to properly train and supervise its officers that verbal questioning, criticism, refusal to stop speaking, request for public information, request for a CAD number, request for officer identification, or verbal disagreement with police is not, by itself, probable cause to seize or arrest a person.

444. Defendant BUFFALO failed to properly train and supervise its officers that resistance to an unlawful seizure cannot be manufactured by officers who escalate an encounter without probable cause and then charge the person with resisting arrest or obstructing governmental administration.

445. Defendant BUFFALO failed to properly train and supervise its officers regarding the difference between lawful enforcement activity and retaliatory enforcement activity.

446. Defendant BUFFALO failed to properly train and supervise its officers regarding the lawful handling of persons who record police and publicly criticize police conduct.

447. Defendant BUFFALO failed to properly train and supervise its officers regarding the constitutional duty to intervene when another officer is violating a person's First or Fourth Amendment rights.

448. Defendant BUFFALO maintained, tolerated, or failed to correct a policy, custom, or practice of officers failing to intervene when other officers unlawfully seize, arrest, use

force against, threaten, retaliate against, or interfere with persons engaged in protected activity.

449. Defendant BUFFALO maintained, tolerated, or failed to correct a policy, custom, or practice of officers using disorderly conduct, resisting arrest, obstructing governmental administration, harassment, or similar charges to justify unlawful seizures, arrests, use of force, retaliation, and malicious prosecutions.

450. Defendant BUFFALO maintained, tolerated, or failed to correct a policy, custom, or practice of officers initiating or supporting criminal charges after unconstitutional seizures and arrests in order to justify or conceal unlawful police conduct.

451. The PLAINTIFF's June 4, 2023 incident demonstrates Defendant BUFFALO's policy, custom, practice, and/or failure to train regarding First Amendment speech, religious street preaching, heckler's veto, viewpoint discrimination, unlawful permit enforcement, unlawful seizure, excessive force, unlawful search and seizure of property, failure to intervene, and malicious prosecution.

452. During the June 4, 2023 incident, Buffalo Police officers allegedly acknowledged that the PLAINTIFF was not doing anything wrong, acknowledged the crowd reaction, acknowledged that officers may need to protect the PLAINTIFF, and nevertheless shifted their focus toward removing, seizing, arresting, and prosecuting the PLAINTIFF.

453. During the June 4, 2023 incident, Defendant ROGOWSKI allegedly failed to identify a specific ordinance or lawful authority for the alleged bullhorn/amplification restriction, stated that he was not accusing the PLAINTIFF of a crime, and then caused the PLAINTIFF to be seized, arrested, searched, charged, and prosecuted.

454. This action is the PLAINTIFF's fourth federal lawsuit involving Defendant BUFFALO and its police officers. This action is also at least the second lawsuit in which the PLAINTIFF alleges that Buffalo Police officers have relied upon a nonexistent, unidentified, or improperly applied "permit" requirement to restrict the PLAINTIFF's use of a bullhorn while street preaching. Since approximately 2017, the PLAINTIFF has had repeated encounters with Buffalo law enforcement involving the same alleged practice, custom, or belief that street preachers must obtain a permit before possessing or using a bullhorn for protected religious speech. This repeated practice demonstrates Defendant BUFFALO's custom, policy, failure to train, failure to supervise, and deliberate indifference regarding the First Amendment rights of street preachers to speak loudly enough to be heard in a public forum.

455. The June 4, 2023 incident was a foreseeable result of Defendant BUFFALO's failure to train and supervise officers regarding public-forum speech, religious speech, amplification, crowd control, and the duty to protect speakers from hostile audiences rather than silence the speaker.

456. The PLAINTIFF's September 24, 2023 incident demonstrates Defendant BUFFALO's policy, custom, practice, and/or failure to train regarding recording police, retaliation against police critics, unlawful seizure, excessive force, unlawful vehicle seizure, unlawful tow practices, unlawful interference with recording devices, failure to intervene, and malicious prosecution.

457. During the September 24, 2023 incident, the PLAINTIFF was recording with his body-worn camera and cellphone camera when he approached Buffalo Police officers to ask why they were observing his parked van.

458. During the September 24, 2023 incident, the PLAINTIFF's van was parked, stationary, not running, not being operated, not being driven, and not abandoned.

459. Defendants initially informed the PLAINTIFF that he was not detained and was free to go.

460. After the PLAINTIFF entered his parked van to show that it was not abandoned and that he had an interest in the property, Defendants escalated the encounter, went hands-on, seized the PLAINTIFF, threatened taser force, removed the PLAINTIFF from the van, placed the PLAINTIFF in handcuffs, seized his keys, towed the van, and caused criminal charges and traffic tickets to be issued.

461. During the September 24, 2023 incident, one or more officers allegedly grabbed the PLAINTIFF's body-worn camera, attempted to access it, attempted to turn it off, and damaged it.

462. During the September 24, 2023 incident, Defendant MORETTI allegedly stated words to the effect of, "Yeah, I know about his channel, we all watch his channel, we know what he does," while shaming the PLAINTIFF.

463. Defendant MORETTI's statement supports a reasonable inference that Defendant BUFFALO's officers were aware of the PLAINTIFF's police-accountability activity, recordings, YouTube channel, and criticism of Buffalo Police officers.

464. The September 24, 2023 incident was a foreseeable result of Defendant BUFFALO's failure to train and supervise officers regarding protected recording, retaliation, vehicle seizures, use of force, towing practices, malicious prosecution, and interference with recording devices.

465. Defendant BUFFALO maintained, enforced, or permitted an impound and vehicle-release policy, custom, or practice requiring impounded vehicles to be registered, plated, and insured before release, regardless of whether the owner intended to drive the vehicle out or have the vehicle towed out by a tow company.

466. As applied to the PLAINTIFF, Defendant BUFFALO's vehicle-release policy unreasonably prolonged the seizure of the PLAINTIFF's property.

467. Defendant BUFFALO's vehicle-release policy forced the PLAINTIFF to register the van, insure the van, and pay towing and storage fees before recovering the van, even though the PLAINTIFF disputed the lawfulness of the initial tow and sought the return of his property.

468. Defendant BUFFALO's vehicle-release policy did not merely regulate whether the van could be driven on public roads but operated to prevent the PLAINTIFF from recovering his own property unless he complied with registration and insurance requirements.

469. Defendant BUFFALO's policy was unconstitutional as applied because it treated the right to recover seized property as conditioned upon registering and insuring the vehicle, even where the owner did not seek to operate or drive the vehicle from impound.

470. Defendant BUFFALO's policy caused towing fees, storage fees, registration expenses, insurance expenses, and other financial damages to accumulate against the PLAINTIFF.

471. Defendant BUFFALO further threatened the PLAINTIFF with the sale of his van while the criminal proceedings were still pending.

472. Out of fear that Defendant BUFFALO would sell his property against his will, the PLAINTIFF was forced to register the van, obtain insurance, and pay several hundreds of dollars to recover his property from the Buffalo Impound.

473. Defendant BUFFALO's impound-release policy, as applied to the PLAINTIFF, constituted an unreasonable continuation of the seizure of the PLAINTIFF's property under the Fourth Amendment.

474. Defendant BUFFALO's impound-release policy, as applied to the PLAINTIFF, also constituted an unconstitutional condition by forcing the PLAINTIFF to satisfy registration and insurance requirements as a condition of recovering property that had allegedly been unlawfully seized.

475. Defendant BUFFALO's policy, custom, or practice regarding impounded vehicles was a moving force behind the PLAINTIFF's damages arising from the tow, impound, storage fees, threat of sale, and forced payment to recover the van.

476. The PLAINTIFF's April 4, 2026 incident demonstrates Defendant BUFFALO's policy, custom, practice, and/or failure to train regarding verbal questioning of police, retaliatory threats, unlawful seizures, excessive force, false arrest, and failure to intervene.

477. During the April 4, 2026 incident, Defendants BOH and VITELLO were present at the PLAINTIFF's property while responding to a call for service involving another person and an upstairs unit.

478. During the April 4, 2026 incident, the PLAINTIFF asked questions, requested the CAD number, mentioned FOIL/public records, challenged Defendant BOH's authority, and verbally objected to Defendant BOH's conduct.

479. Defendant BOH allegedly became aggressive, ordered the PLAINTIFF back inside his own home, accused the PLAINTIFF of interfering with the investigation, grabbed the PLAINTIFF, caused the PLAINTIFF to be handcuffed, and told the PLAINTIFF he was under arrest for interfering with the investigation.

480. Defendant VITELLO allegedly joined Defendant BOH in shoving the PLAINTIFF into the side of his home and handcuffing the PLAINTIFF.

481. Defendant BOH then allegedly conditioned the PLAINTIFF's release from handcuffs on the PLAINTIFF not asking more questions and going back inside the home, otherwise the PLAINTIFF would be placed under arrest.

482. The April 4, 2026, incident was a foreseeable result of Defendant BUFFALO's failure to train and supervise officers regarding the constitutional right to ask questions, request public information, verbally object, and remain free from retaliatory seizure and unlawful force.

483. The repeated incidents involving the PLAINTIFF demonstrate a pattern, custom, and practice by Defendant BUFFALO and its officers of escalating lawful speech, recording, questioning, and criticism into seizures, threats, arrests, force, property seizures, charges, or other adverse actions.

484. Defendant BUFFALO knew or should have known that its officers required additional training and supervision regarding the First Amendment and Fourth Amendment rights implicated by the incidents alleged in this Complaint.

485. Defendant BUFFALO knew or should have known that failure to train and supervise officers regarding these rights would result in officers unlawfully retaliating against, seizing, arresting, threatening, using force against, prosecuting, or interfering with persons engaged in protected activity.

486. Defendant BUFFALO's failure to train, supervise, discipline, and correct unconstitutional conduct amounted to deliberate indifference to the rights of the PLAINTIFF and similarly situated persons.

487. Defendant BUFFALO's policymakers, supervisors, and final decisionmakers ratified, approved, tolerated, or failed to correct the unconstitutional conduct alleged herein by allowing officers to submit charges, maintain prosecutions, seize property, continue impound fees, enforce the vehicle-release policy, and avoid discipline or correction.

488. Defendant BUFFALO ratified or tolerated the unconstitutional conduct by failing to meaningfully investigate, discipline, retrain, correct, or remedy the conduct of the officers involved in the PLAINTIFF's incidents.

489. Defendant BUFFALO ratified or tolerated the unconstitutional conduct by allowing officers to use criminal charges and traffic tickets to justify unconstitutional seizures, arrests, force, property interference, and retaliation.

490. Defendant BUFFALO ratified or tolerated the unconstitutional conduct by maintaining and enforcing the impound-release policy against the PLAINTIFF after his van was seized and towed.

491. Defendant BUFFALO's policies, customs, practices, failures to train, failures to supervise, failures to discipline, ratification, and deliberate indifference were the moving force behind the violations of the PLAINTIFF's constitutional rights.

492. As a direct and proximate result of Defendant BUFFALO's municipal policies, customs, practices, failures, ratification, and deliberate indifference, the PLAINTIFF suffered loss of liberty, physical restraint, humiliation, emotional distress, fear, interruption and chilling of constitutional rights, deprivation of property, damage to property, towing and impound expenses, forced registration and insurance expenses, criminal prosecution, traffic tickets, reputational harm, and other damages.

493.By the foregoing acts and omissions, Defendant BUFFALO violated the PLAINTIFF's rights under the First and Fourth Amendments to the United States Constitution and 42 U.S.C. § 1983.

494.The PLAINTIFF is entitled to compensatory damages, costs, attorney's fees if applicable, and all other relief this Court deems just and proper.

**WHEREFORE**, the Plaintiff is seeking judgment against the Defendants, in each of them in their individual, private, personal, and official capacities, on each and every cause of action jointly and severally, as follows:

## FIRST CAUSE OF ACTION
## AGAINST
## DEFENDANTS
## ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON:
## FIRST AMENDMENT RETALIATORY ARREST / RETALIATORY SEIZURE
## 42 U.S.C. § 1983

a.) on the First Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## SECOND CAUSE OF ACTION
## AGAINST
## DEFENDANTS ROGOWSKI, MYERS, MUHAMMAD, DOYLE, FORD, FERRO, AND TYSON:
## FIRST AMENDMENT HECKLER'S VETO/ AUDIENCE-REACTION SUPPRESSION, 42 U.S.C. § 1983

b.) on the Second Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## THIRD CAUSE OF ACTION
## AGAINST
## DEFENDANTS ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, AND TYSON
## FIRST AMENDMENT VIEWPOINT DISCRIMINATION
## 42 U.S.C. § 1983

c.) on the Third Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## FOURTH CAUSE OF ACTION
## AGAINST
## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON:
## FIRST AMENDMENT PRIOR RESTRAINT/ UNLAWFUL PERMIT ENFORCEMENT
## 42 U.S.C. § 1983

d.) on the Fourth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## FIFTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, AND

## TYSON:

## FIRST AMENDMENT FREE EXERCISE INTERFERENCE

## 42 U.S.C. § 1983

e.) on the Fifth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## SIXTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO,

## and TYSON

## FOURTH AMENDMENT FALSE ARREST/ UNLAWFUL SEIZURE

## 42 U.S.C. § 1983

a.) on the Sixth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**SEVENTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**ROGOWSKI, MUHAMMAD, MYERS, and FERRO**

**FOURTH AMENDMENT EXCESSIVE FORCE**

**U.S.C. § 1983**

g.) on the Seventh Cause of Action in an amount that exceeds the jurisdictional limits

of all lower courts, plus punitive damages in the amount of ONE HUNDRED

THOUSAND DOLLARS ($100,000); and/or

**EIGHTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**ROGOWSKI AND MUHAMMAD**

**FOURTH AMENDMENT UNREASONABLE**

**SEARCH AND SEIZURE OF PROPERTY**

**42 U.S.C. § 1983**

h.) on the Eighth Cause of Action in an amount that exceeds the jurisdictional limits

of all lower courts, plus punitive damages in the amount of ONE HUNDRED

THOUSAND DOLLARS ($100,000); and/or

## NINTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## ROGOWSKI, MUHAMMAD, MYERS, FORD, DOYLE, FERRO, and TYSON

## FAILURE TO INTERVENE

## 42 U.S.C. § 1983

i.) on the Nineth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## TENTH CAUSE OF ACTION

## AGAINST

## DEFENDANT

## ROGOWSKI

## MALICIOUS PROSECUTION

## 42 U.S.C. § 1983

j.) on the Tenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**ELEVENTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANT**

**ROGOWSKI**

**MALICIOUS PROSECUTION**

**UNDER NEW YORK STATE LAW CLAIM**

k.) on the Eleventh Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWELFTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**GEHR, MORETTI, CARLSON, AND BRIDGE**

**FIRST AMENDMENT RETALIATION**

**42 U.S.C. § 1983**

l.) on the Twelfth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## THIRTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## GEHR, CARLSON, AND BRIDGE

## FOURTH AMENDMENT FALSE ARREST/ UNLAWFUL SEIZURE

## 42 U.S.C. § 1983

m.) on the Thirteenth Cause of Action in an amount that exceeds the jurisdictional

limits of all lower courts, plus punitive damages in the amount of ONE

HUNDRED THOUSAND DOLLARS ($100,000); and/or

## FOURTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## GEHR, CARLSON, AND BRIDGE

## FOURTH AMENDMENT EXCESSIVE FORCE

## 42 U.S.C. § 1983

n.) on the Fourteenth Cause of Action in an amount that exceeds the jurisdictional

limits of all lower courts, plus punitive damages in the amount of ONE

HUNDRED THOUSAND DOLLARS ($100,000); and/or

## FIFTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## GEHR, MORETTI, CARLSON, BRIDGE, AND MILLER

## FOURTH AMENDMENT UNLAWFUL SEIZURE OF

## PROPERTY/UNLAWFUL TOW

## 42 U.S.C. § 1983

o.) on the Fifteenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## SIXTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS

## GEHR, CARLSON, BRIDGE, MORETTI, AND MILLER

## FAILURE TO INTERVENE

## 42 U.S.C. § 1983

p.) on the Sixteenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## SEVENTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANT

## GEHR

## MALICIOUS PROSECUTION

## 42 U.S.C. § 1983

q.) on the Seventeenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## EIGHTEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANT GEHR

## MALICIOUS PROSECUTION

## UNDER NEW YORK STATE LAW CLAIM

r.) on the Eighteenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## NINETEENTH CAUSE OF ACTION

## AGAINST

## DEFENDANTS BOH AND VITELLO

## FIRST AMENDMENT RETALIATORY ARREST/ SEIZURE

## 42 U.S.C. § 1983

s.) on the Nineteenth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

## TWENTIETH CAUSE OF ACTION

## AGAINST

## DEFENDANT BOH

## FIRST AMENDMENT PRIOR RESTRAINT / RETALIATORY THREAT

## 42 U.S.C. § 1983

t.) on the Twentieth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWENTY-FIRST CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS BOH AND VITELLO**

**FOURTH AMENDMENT FALSE ARREST / UNLAWFUL SEIZURE**

**42 U.S.C. § 1983**

u.) on the Twenty-First Cause of Action in an amount that exceeds the jurisdictional

limits of all lower courts, plus punitive damages in the amount of ONE

HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWENTY-SECOND CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**BOH AND VITELLO**

**FOURTH AMENDMENT EXCESSIVE FORCE**

**42 U.S.C. § 1983**

v.) on the Twenty-Second of Action in an amount that exceeds the jurisdictional

limits of all lower courts, plus punitive damages in the amount of ONE

HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWENTY-THIRD CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**BOH AND VITELLO**

**FAILURE TO INTERVENE**

**42 U.S.C. § 1983**

w.) on the Twenty-Third Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWENTY-FOURTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS**

**BOH AND VITELLO**

**FALSE ARREST / FALSE IMPRISONMENT**

**UNDER NEW YORK STATE LAW CLAIM**

x.) on the Twenty-Fourth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

**TWENTY-FIFTH CAUSE OF ACTION**

**AGAINST**

**DEFENDANTS BOH AND VITELLO**

**UNDER NEW YORK STATE LAW CLAIMT**

**ASSAULT AND BATTERY**

y.) on the Twenty-Fifth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of ONE HUNDRED THOUSAND DOLLARS ($100,000); and/or

### TWENTY-SIXTH CAUSE OF ACTION
### AGAINST
### DEFENDANT
### BUFFALO
### MONELL MUNICIPAL LIABILITY
### 42 U.S.C. § 1983

z.) on the Twenty-Sixth Cause of Action in an amount that exceeds the jurisdictional limits of all lower courts, plus punitive damages in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000); and/or

aa) Permanent injunctive relief of any agents in City of Buffalo from violating the PLAINTIFF'S constitutional rights; and/or

bb) Constitutional training semi-annually or Constitutional training annually preferably on the First, Fourth, and Fifth Amendments. As well as training of public speakers with bullhorns regarding the noise ordinance.

cc) Dissolving the motor vehicle policy requiring that all vehicles must be registered, insured, and released to someone with a valid drivers license when there is an option to have the property towed out to an address.

oo.) together with the costs, disbursements, pursuant to 42 U.S.C. §1988 of this

action and for such other and further relief as the court may deem just and proper.

Dated this day on the 1st Day of June 2026.

Joshua G. Harris
In Propria Persona